**Diana M. BERNAL, Plaintiff,**

v.

**ALL AMERICAN INVESTMENT REALTY, INC., All American Mortgage Bank, Inc., LTDS Petroleum, Inc., LTDAS Petroleum, Inc., Labelle Petroleum, Inc., and Tariq Hussain, Defendants.**

No. 05–60956–CIV.

United States District Court, S.D. Florida.

March 23, 2007.

Dion J. Cassata, Cassata & Hanson PL, Fort Lauderdale, FL, John Jay Hanson, Cassata & Hanson PL, Hallandale Beach, FL, for Plaintiff.

Stuart A. Rosenfeldt, Michael Anthony Pancier, Rothstein Rosenfeldt Adler, Fort Lauderdale, FL, Chris Kleppin, Glasser Boreth Ceasar & Kleppin, Plantation, FL, for Defendants.

*ORDER (1) AFFIRMING REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTIONS FOR SANCTIONS; AND (2) MODIFYING THE RECOMMENDED REMEDIES*

SEITZ, District Judge.

THIS MATTER is before the Court on the Report and Recommendation on Plain-

tiff's Motions for Sanctions [DE–108], issued by United States Magistrate Judge Chris M. McAliley. Magistrate Judge McAliley's Report covers two motions: (1) Plaintiff's Motion to Strike Defendants' Answer and Affirmative Defenses as Sanctions and Enter a Finding of Liability With Trial to be Held on the Issue of Damages [DE–48]; and (2) Plaintiff's Motion for Attorneys' Fees and Costs Pursuant to 28 U.S.C. § 1927, Federal Rules of Civil Procedure 26(g), 37(a), (b), and (c), and the Court's Inherent Powers [DE–82]. Also before the Court is a request by nonparty Chris Kleppin, former counsel to the five entity Defendants and individual Defendant Tariq Hussain, for a hearing regarding his objections to Magistrate Judge McAliley's Report [DE–121].

The Court has undertaken a *de novo* review of the record, including a careful review of the transcripts of all hearings before Magistrate Judge McAliley [1] and all filed objections to the Report. The Court shall affirm and adopt all of Magistrate Judge McAliley's factual findings, as they reflect a neutral summation of the facts that the record more than amply supports. Magistrate Judge McAliley's legal conclusions are consistent with a correct application of the law to those facts; however, the Court shall slightly modify her recommended remedies.

The Court shall impose monetary sanctions on both Kleppin and Hussain, and shall refer Kleppin to The Florida Bar, the District of Columbia Bar, and the Bar of the Commonwealth of Massachusetts, as well as this District's Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance. This case shall

1. These include hearings on December 6, 2005; January 12 and 19, 2006; and February 3 and 17, 2006.

proceed to trial with the jury being instructed as to two facts: (i) Defendant Hussain and the five entity Defendants are employers subject to the FLSA; and (ii) Hussain employed Plaintiff to work for him and the five entity Defendants. At trial, the Court shall also instruct the jury as to Hussain's spoliation of evidence and procurement of false evidence, which they may consider in assessing his credibility. The Court may also instruct the jury as to Defendants' record-keeping obligations, based on *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 683–84, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). Finally, the Court overrules both non-party Chris Kleppin's and Defendants' objections to the Report, as explained below, with the exception of Defendants' objection to the entry of final default judgment against them.

## I. NON-PARTY CHRIS KLEPPIN

### A. *Request for New Evidentiary Hearing as to Credibility*

Kleppin's request for another evidentiary hearing is denied, as the basis for Judge McAliley's not crediting his testimony[2] is patent from the hearing transcripts. Magistrate Judge McAliley spent five hearings, consisting of many hours, assessing Kleppin's credibility, which included evaluating (1) his opportunity to observe accurately the events about which he testified; (2) his directness (or lack thereof) in answering her questions; (3) his lack of recall of recent, noteworthy events; (4) the contradictions between his testimony and other evidence; and (5) his self-interest in placing himself in the best light possible during court proceedings. (For examples of Kleppin's testimony which support the lack of credibility finding, see Jan. 12, 2006 Tr.

27–28, 82–88, 102–03, 108–112; Jan. 19, 2006 Tr. 5–18, 44–64, 78–81, 84.)[3]

It is evident from the transcripts that Kleppin did not answer questions directly, consistently had an excuse for his actions, and repeatedly (even conveniently) could not remember details about important, recent facts. Instead of answering Magistrate Judge McAliley's questions about his own actions, Kleppin tried to divert her attention by launching into details concerning the Plaintiff's allegedly dishonest actions. Further, Kleppin's answers to questions concerning his legal skills and knowledge of legal rules showed that he has little regard for the Federal Rules of Civil Procedure—either he does not choose to follow the rules, or he is simply so incompetent that he does not know which rules to follow, what they mean, or when to follow them. Given the fact that he was on the law review of his accredited law school, it is difficult to accept the latter option.

Kleppin's testimony reflects his plan to pursue his view of this case at all costs—without the restraint that comes from independent judgment and professional detachment. Because the Court is adopting Magistrate Judge McAliley's well-supported credibility findings, there is no legal basis for another evidentiary hearing to repeat the testimony he has already given. Kleppin had ample opportunity to provide truthful testimony to the Court. Therefore, Magistrate Judge McAliley's determination that he was not credible will not be disturbed.

### B. *Objections to Report*

#### 1. *Kleppin's "mind-set".*

Kleppin's subjective state of mind is not an issue in Magistrate Judge McAliley's

---

2. *See* particularly page 53 of Magistrate Judge McAliley's Report.

3. These citations do not constitute an exhaustive list of the instances in which Kleppin provided less-than-credible answers to Magistrate Judge McAliley's questions.

Report. Magistrate Judge McAliley applied an objective standard in assessing Kleppin's conduct in that she considered how a reasonable attorney under the circumstances would have acted. Based on the totality of the circumstances, she concluded that no reasonable attorney in Kleppin's situation would have behaved the way he did, and that in fact, Kleppin had grossly deviated from reasonable conduct. This Court affirms that conclusion.

It is disappointing that Kleppin's attorney has chosen to argue that Kleppin's "missteps" in this case "were the product of inexperience and naiveté...." (Kleppin Objs. at 2.) By his own admission to this Court in a proceeding in another case, Kleppin graduated from law school in 1996, and has served as lead trial counsel in six trials in federal court and approximately three trials in state court.[4] He is a named partner in his law firm, and a review of this District's docket reveals that he has been involved in at least 90 cases in the District. Further, in seeking $400,000 in attorneys' fees in an overtime case pending in this District, Kleppin signed a sworn affidavit in which he attested that his $375 hourly rate was "commensurate with his knowledge and experience." (Kleppin Aff.[5] ¶ 5.) Kleppin's expert witness in that case, attorney Peter T. Maverick, attested to Kleppin's "excellent legal work" and to his charged rate being commensurate with his experience. (Maverick Decl.[6] ¶ 9.) Kleppin cannot herald his experience and legal skills when it suits him (in

trying to recover attorneys' fees), only to turn around and claim naiveté and inexperience to avoid a sanction for fees.

2. *Kleppin's facilitation/encouragement of Defendant Hussain's discovery violations.*

Despite Kleppin's protestations to the contrary, the record supports this factual finding. At the January 12, 2006 hearing, Hussain stated that, if a discovery request was not clear to him, he would simply deny the request. Notably, at his deposition, Hussain testified that he denied requests he believed he should not have to answer, because of his view that the lawsuit was "bogus." He admitted at the January 12th hearing that he never reviewed any documents in his possession in order to answer discovery requests, prior to Magistrate Judge McAliley's December 6, 2005 Order compelling discovery. Also, many of Hussain's discovery responses proved false.

Kleppin shared his client's view that the lawsuit was "bogus," and thus, facilitated and encouraged his client's behavior by failing properly to oversee his client's discovery efforts. Of particular note, Kleppin signed Hussain's false responses denying that his companies had ever made use of the interstate mail and telephone systems and nationally chartered banks. As Magistrate Judge McAliley pointed out, common sense dictates that any company similar to those Hussain owns and operates, no matter how small, would receive or place

---

4. Kleppin's attorney in this matter stated that Kleppin has only been a lawyer for four (4) years. This is misleading. Although Kleppin has only been a member of The Florida Bar for four (4) years (since 2003), he was admitted to both the District of Columbia Bar and the Bar of the Commonwealth of Massachusetts in *2001*.

5. "Kleppin Aff." refers to the Affidavit of Chris Kleppin, submitted in support of his

Motion for Attorneys' Fees [contained in DE–141, in Case No. 05–60822–CIV–DIMITROULEAS/TORRES].

6. "Maverick Decl." refers to the Sworn Declaration of Peter T. Maverick, submitted in support of Kleppin's Motion for Attorneys' Fees [contained in DE–141, in Case No. 05–60822–CIV–DIMITROULEAS/TORRES].

an out-of-state phone call, receive or send mail out of state, or make a deposit in a nationally chartered bank. That Kleppin did not challenge Hussain's denial of these inquiries is so unreasonable that it constitutes encouragement of the client's obstructive behavior.

Moreover, Kleppin admitted that he had never once visited his client's office. He never knew what documents, if any, his client had reviewed in order to answer discovery requests. Kleppin's understanding was that Hussain had been "looking for some things," but he could not say what "things" Hussain had found. At the January 12th hearing, Kleppin attempted to justify Hussain's behavior, by explaining that he [Kleppin] did not know how specific discovery responses had to be. The likelihood that Kleppin had no familiarity with the rules, given his experience in federal court which included having to pass a test on the rules for admission to the Bar of this Court, is so implausible that the only reasonable conclusion is that he lied to Magistrate Judge McAliley. Kleppin's conduct was a willful abuse of the discovery process.

### 3. *Kleppin's role with respect to the Khan affidavit.*

To persuade this Court that it should either overlook or deem as appropriate Kleppin's actions with respect to the Khan affidavit, Kleppin's counsel argues that an "*affidavit* is qualitatively different than any other piece of 'bombshell evidence' that might surface in a case, *because it is under oath*," and therefore "provide[s] some measure of evidentiary support for Mr. Kleppin's ensuing acts." (Kleppin Objs. at 4–5) (emphasis in original). Kleppin cites no legal authority for his position, because there is none. A lawyer can not blindly rely on an affidavit—even if it is signed under oath—once he has information that raises questions about its contents.

Shortly before the lengthy December 6, 2005 hearing that resulted in Magistrate Judge McAliley's ordering Hussain to respond to numerous discovery requests, Hussain telephoned Kleppin with information that the Plaintiff had allegedly bribed a man named Mohammad Khan for his favorable testimony. Instead of speaking with Khan to gather the facts, Kleppin drafted an affidavit for Khan's signature on December 5, 2005, solely based on Hussain's recounting of what Khan allegedly knew. When the December 6th hearing demonstrated that Hussain had not been truthful in his discovery responses, Kleppin still made no effort to speak to Khan to independently investigate the situation. Instead, he allowed Hussain to obtain Khan's signature on the affidavit. Indeed, even when the signed affidavit Hussain returned to Kleppin showed alterations from the original version Kleppin had prepared, Kleppin did not question his client about the affidavit's veracity, nor did he question his client or Khan after his December 15, 2005 telephone discussion with Plaintiff's counsel who said that Plaintiff vehemently denied the charges.

A month later, at the January 19, 2006 hearing regarding the Khan affidavit, Kleppin stated that he could not even remember the specific details of his 20–30 minute meeting with his client to discuss Khan's "bombshell" information. (Jan. 19, 2006 Tr. at 17–18.) Kleppin claimed that he wanted to depose Khan, and even pointed to the deposition notice he issued. But, Kleppin later stated that when Hussain insisted on submitting an affidavit from Khan rather than deposing him, Kleppin did not pursue Khan's deposition as Hussain "wouldn't take no for an answer." Acutely aware of the "bad blood" between Hussain and the Plaintiff, of how much

Hussain wanted to be rid of this case, the fact that Hussain had not been truthful in his discovery responses, and that Plaintiff's counsel denied the accusations when verbally advised of this "bombshell evidence," Kleppin did nothing to verify that Hussain's information about Khan was trustworthy before filing the affidavit.

Although the Khan affidavit accused the Plaintiff of a serious crime she denied committing, the record reflects that Kleppin neither (1) conducted any investigation into the facts, including speaking to or deposing Khan; nor (2) took the matter to the proper authorities. Instead, Kleppin focused only on how to use the affidavit to make the case "go away" for his client. To that end, he attached the affidavit to his response to Plaintiff's December 15, 2005 motion for sanctions and asked for sanctions against the Plaintiff and her lawyers, claiming Plaintiff's motion for sanctions was a "preemptive strike" to avoid the affidavit's impact—even through Kleppin was aware that Plaintiff's counsel had prepared the sanctions motion prior to learning of the bribery charges. As Magistrate Judge McAliley properly found, Kleppin's conduct with respect to the Khan affidavit under these circumstances was a reckless and gross deviation from reasonable conduct.

4. *Kleppin's characterization of Plaintiff's sanctions motion as a "preemptive strike."*

On page 1329, Magistrate Judge McAliley's Report notes that Kleppin's intentionally false statement was the characterization of the Plaintiff's motion for sanctions as a "preemptive strike to the filing of a Rule 11 Motion by the Defendants, because the Defendants recently came into possession of two important pieces of evidence." The timeline in the record evidence amply supports the factual finding that Kleppin made a knowing, false statement to the Court in this regard.

5. *Kleppin's assertion of the defense that the Defendants were not engaged in interstate commerce.*

Kleppin's objection that Magistrate Judge McAliley "implicitly criticized Mr. Kleppin for asserting the defense that Defendants were not engaged in interstate commerce ..." misses the point in Magistrate Judge McAliley's Report. The point is that Kleppin's approach was to make such a determination unilaterally, rather than to produce documents requested in discovery to support the defense. Ultimately, documentary evidence (*i.e.* the tax returns) showed that Kleppin's position was not entirely accurate.

6. *Magistrate Judge McAliley's finding that Kleppin had no reasonable basis to believe that Hussain was not the dishonest party.*

Kleppin stood by and watched as Hussain turned over documents containing Plaintiff's name, showing that she had been paid for work, and other documents showing that at least one of his businesses made enough income to fall within the purview of the FLSA—after Hussain had made representations that no such documents existed. After experiencing the December 6, 2005 hearing, the transcript of which underscores the instances in which Hussain had not been candid with Kleppin during discovery production, Kleppin had did not have a reasonable basis to assert that his client was not the dishonest party.

7. *Interrogatory and requests for admission regarding Plaintiff's counsel's alleged copying of files.*

This objection lacks merit. The timing of these discovery requests (the day after Plaintiff filed her December 15, 2005 mo-

tion for sanctions for Defendants' failure to comply with Magistrate Judge McAliley's December 9, 2005 Order compelling discovery) and their subject matter (whether the Plaintiff knew that her lawyer transferred or copied information from Kleppin's computer onto his own) lead to only one reasonable conclusion: Kleppin's primary purpose in propounding this discovery was to intimidate the Plaintiff, rather than to seek evidence relevant to the issues of liability or damages.[7]

### 8. *Kleppin's Rule 11 Letter.*

Kleppin objects to Magistrate Judge McAliley's characterization of his Rule 11 letter as "mean-spirited" and unprofessional, noting that "any suggestion ... that a pre-motion 'Rule 11 letter' is *per se* sanctionable or unprofessional should be rejected." (Kleppin Objs. at 10.) This objection again misses the point: the content of Kleppin's letter demonstrates that he believes proper litigation tactics include personal attacks on opposing parties and counsel. The objection is overruled.

### 9. *Contradictions in Kleppin's testimony.*

This objection is also overruled. Magistrate Judge McAliley properly drew an adverse inference from Kleppin's various inconsistent statements, dodging of questions, and alleged inability to recall recent events which Kleppin himself considered significant.

### 10. *Kleppin's representations regarding Defendants' gross income.*

Magistrate Judge McAliley's conclusion that "Kleppin's failure to review any of his clients' financial records before issuing these discovery responses, and repeated

argument to the Court that Defendants' gross annual income fell below the jurisdictional amount, fell short of his obligations under Rule 26(g) and Rule 11(b)" is amply supported by the record evidence as set out in her Report. Kleppin failed to undertake the most basic first step in the performance of his duties as counsel and an officer of the Court, which is to review the records he is relying on.

### 11. *Kleppin's narrowing of the scope of Defendants' discovery responses.*

As the Report reflects, Kleppin's deception lay in the failure to share with opposing counsel his restrictive interpretation of the discovery requests. By his own testimony, Kleppin's involvement in the discovery process was at best cavalier: he chose simply to rely on Hussain's representations regarding the documents Hussain found and reviewed, without questioning whether or not Hussain had actually searched for all documents in his possession and whether or not Hussain understood the discovery being requested of him. As Magistrate Judge McAliley found, Kleppin "made no reasonable efforts to insure that his client was providing truthful discovery responses." (Report at 43.)

### 12. *Erroneous answers to requests for admissions.*

Civil discovery is designed to force both sides to lay the evidence "on the table," so that each side has the opportunity to assess the merits of its position. Reasonable and responsible counsel speak with opposing counsel to clarify the scope of discovery and any confusion as to definitions. Further, this Court notified the parties

---

**7.** Kleppin insists that such discovery was relevant to the issue of attorneys' fees; however, Plaintiff would have had first to prevail on liability before the issue of attorneys' fees would become relevant.

that Magistrate Judge McAliley held a weekly discovery calendar, wherein the parties could address discovery disputes without filing formal motions. Kleppin chose neither of these quick, low-cost mechanisms to resolve discovery questions. To affirm this objection would require the Court to ignore the letter and spirit of the discovery rules and endorse a strained "legal technicality" approach to excuse improper conduct.

### 13. *No evidentiary support for a planned Rule 11 motion.*

When asked to identify the evidentiary support he had for Khan's bribery accusation (which, in turn, would support a potential Rule 11 motion), Kleppin could point only to his belief that the Plaintiff was dishonest, and that Hussain was trustworthy. Kleppin's only basis for believing that Plaintiff had brought a frivolous lawsuit was the word of a client who, at least by the time of the December 6, 2005 hearing, had proven to be less than trustworthy. Documents bearing Plaintiff's name surfaced, as did income tax returns showing FLSA coverage for at least one of Hussain's companies. Magistrate Judge McAliley caught Hussain in numerous lies, and showed that he had willfully abdicated his discovery obligations. Although Kleppin did not file a Rule 11 motion, he had no basis for even threatening to file one. Kleppin's behavior was willfully abusive and cannot be tolerated.

## II. DEFENDANT TARIQ HUSSAIN

The thrust of Defendants' objections is that the Court should not sanction them by entering a default judgment for their conduct in this matter, because such a sanction is too harsh and is against the strong judicial policy of disposing of matters on their merits. First, Defendants maintain that their discovery violations were neither willful nor in bad faith, but rather, were caused by Kleppin—who withheld documents, failed to give Hussain proper instructions, made threats of baseless sanctions, propounded irrelevant and intimidating discovery requests, and filed a false affidavit. While Kleppin bears responsibility for his abuse of the justice system in this case, Hussain is also responsible for intentionally disrupting this litigation.

Hussain's testimony at the discovery hearings and at his deposition reveals his destructive intent. From the beginning, he was angry at being sued, believing this to be a "bogus lawsuit." As such, he acted on his belief that Plaintiff was not entitled to any discovery. In court, Hussain tried to minimize the extent of his discovery violations by claiming that they were the product of "innocent mistakes" or his failure to understand the questions asked. But, at his deposition, Hussain made quite clear that he intentionally did not answer certain discovery requests because he did not *want* to answer them: "Sir, I don't feel I like to answer this question. They are bogus lawsuit they file against me and my corporation." (*See* DE–73, Ex. 24, pg. 65–67.) Although Hussain made 11th hour attempts to remedy his discovery violations with supplemental responses, he gave no real explanation for the last minute changes.

Defendants would like to explain away each of Hussain's discovery violations in isolation, and to place all of the blame for his actions on his lawyer. But, when the totality of the circumstances are considered, the record evidence supports Magistrate Judge McAliley's conclusion that Hussain was simply not credible. In short, the clear picture is that Hussain's plan was to frustrate the proceedings by evading discovery requests, hiding docu-

ments, and vilifying the Plaintiff and her counsel.

Finally, but most importantly, Hussain procured false evidence. He offered Khan favorable refinancing terms on a home loan in exchange for Khan's signature on a false affidavit. He also placed false dates on the loan disclosure paperwork he gave to Khan, in an admitted effort to make it appear that he was not offering Khan a bribe. The uncontradicted evidence is that Hussain was the one who sought out Khan and offered him a special deal on a new home loan (about which Khan initially indicated he had no interest), and that, two months later on the eve of a critical hearing, the "bombshell evidence" surfaced.

It was in light of the totality of these circumstances that Magistrate Judge McAliley considered Khan's invocation of his 5th Amendment right not to incriminate himself when asked about his statement under oath that Plaintiff bribed him. If the accusations against Plaintiff were true, Khan would have had no reservation about admitting them. Magistrate Judge McAliley properly drew the negative inferences that the affidavit was false, and that Hussain—who insisted on obtaining Khan's affidavit rather than deposing him and who offered Khan a financial benefit, which he tried to cover up—knew all along that the affidavit was false. Kleppin certainly should not have filed the affidavit with the Court, but it was Hussain who instigated its procurement and notarization. Magistrate Judge McAliley properly found that Hussain willfully falsified documents and refused to meet his discovery obligations. Hussain's conduct demonstrates a knowing and intentional abuse of the justice system which cannot be condoned.

## III. APPROPRIATE SANCTIONS

### A. *Attorneys' Fees*

On March 16, 2007, this Court held a conference in this case, to address certain issues related to Magistrate Judge McAliley's Report and Recommendation and the objections thereto. At the conference, the Court ordered Plaintiff's counsel, Mr. Cassata, to file the documentation concerning his time and associated fees with respect to all matters reasonably flowing from the December 21, 2005 response to Plaintiff's motion for sanctions, the hearings thereon, and all responses and objections filed in connection with Magistrate Judge McAliley's Report and Recommendation. The Court noted that this should be the same documentation/assessment he used in settlement negotiations with Kleppin. The Court also ordered Mr. Cassata to produce for the Court's *in camera* review a copy of the settlement agreement between Kleppin and the Plaintiff, regarding Kleppin's potential attorneys' fees liability to the Plaintiff. Mr. Cassata complied with the Court's Order, and this Court has reviewed the documents he filed.

The Court finds that Kleppin and Hussain each should be sanctioned for half of the attorneys' fees incurred relating to (1) preparation for and attendance at the December 6, 2005 hearing; (2) preparation of Plaintiff's motion for sanctions relating to Defendants' failure to comply with Magistrate Judge McAliley's December 6, 2005 Order; (3) the attorney time spent addressing Defendants' response to Plaintiff's motion for sanctions; (4) preparation for and attendance at the January 12 and 19, and February 3 and 17, 2006 hearings; and (5) preparation of Plaintiff's responses to Magistrate Judge McAliley's February 21, 2006 Order to Show Cause [DE–85]. These attorney's fees would not have been incurred but for Kleppin's and Hussain's conduct, described above. Any lesser sanction would fail to punish adequately the intentional violations and would not ensure future compliance with Court or-

ders and rules of Court. Sanctions are imposed against Kleppin pursuant to 28 U.S.C. § 1927, Federal Rule of Civil Procedure 11(b)(1) and (3), and this Court's inherent power to regulate litigation and to sanction litigants and their counsel for abusive practices. Sanctions are imposed against Hussain pursuant to this Court's inherent power to do so.[8]

## B. *Non–Monetary Sanctions*

Defendants maintain that striking their answer and entering a default judgment on liability is too severe of a sanction. The Court agrees with this objection and finds that a more nuanced sanction is appropriate, given the genuine issues as to the terms and conditions of Plaintiff's employment.

This case will proceed to trial on liability. However, to address the attempted fraud upon the Court, the Court will instruct the jury that certain facts are deemed established. These facts include, without limit: (1) Hussain and the five entity Defendants are all employers subject to the provisions of the FLSA; and (2) Hussain employed Plaintiff to work for him and the five entity Defendants. Thus, the only issues left for trial are how many hours Plaintiff worked, the period of time she worked, whether she worked more than 40 hours per week, and whether or not she was compensated appropriately for any and all hours over 40 per week. In addition, the Court will give the jury a spoliation of evidence instruction and will instruct the jurors that, in considering Hussain's credibility, they may consider that he knowingly obtained an affidavit to use in Court that falsely accused the Plaintiff of a serious crime and that he falsely

dated documents so that it would not appear that he was offering a bribe for that affidavit. If applicable, the Court will also give an instruction regarding Defendants' record-keeping obligations, based on *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 683–84, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). Accordingly, it is hereby

ORDERED that:

(1) The findings of fact and conclusions of law set forth in Magistrate Judge McAliley's Report and Recommendation [DE–108] are AFFIRMED and ADOPTED as an Order of this Court;

(2) The Court overrules non-party Chris Kleppin's and Defendants' objections to the Report, with the exception of Defendants' objection to entry of default judgment on liability;

(3) The Court modifies Magistrate Judge McAliley's recommended remedies, as follows:

(a) Plaintiff's Motion to Strike Defendants' Answer and Affirmative Defenses as Sanctions and Enter a Finding of Liability With Trial to be Held on the Issue of Damages [DE–48] is DENIED, but as a sanction for Defendant Hussain's conduct in this case, the Court will instruct the jury that the following facts have been established:

(i) Tariq Hussain and the five entity Defendants are employers subject to the overtime provisions of the FLSA; and

(ii) Tariq Hussain employed Plaintiff to work for him and the five entity Defendants;

(b) As part of the sanction, the Court shall instruct the jury on Hussain's spoliation of evidence and procurement of false

---

8. The Court notes that Magistrate Judge McAliley determined that sanctions would also be appropriate against both Kleppin and Hussain pursuant to Federal Rules of Civil Procedure 26(g) and 37(a)(4); however, the sanctions as already imposed account for those that could have been imposed under these Rules.

evidence, which they may consider in assessing his credibility. The Court will also instruct the jury as to Defendants' record-keeping obligations, if applicable;

(4) Plaintiff's Motion for Attorneys' Fees and Costs [DE–82] is GRANTED:

(a) As discussed above, the Court finds that Kleppin and Hussain each should be sanctioned for half of the attorneys' fees incurred relating to (i) the discovery abuses that necessitated preparation for and attendance at the December 6, 2005 hearing; (ii) preparation of Plaintiff's motion for sanctions relating to Defendants' failure to comply with Magistrate Judge McAliley's December 6, 2005 Order; (iii) the attorney time spent addressing Defendants' response to Plaintiff's motion for sanctions; (iv) preparation for and attendance at the January 12 and 19, and February 3 and 17, 2006 hearings; and (v) preparation of Plaintiff's responses to Magistrate Judge McAliley's February 21, 2006 Order to Show Cause [DE–85];

(b) This matter is REFERRED to Magistrate Judge McAliley to determine the reasonableness of the fees and costs set forth in DE–146 (re-filed at DE–147, due to apparent legibility problems), as well as to determine Hussain's ability to pay his portion of the fees and costs she deems reasonable; and

(5) The Court shall refer this Order and Magistrate Judge McAliley's Report and Recommendation to The Florida Bar, the District of Columbia Bar, and the Bar of the Commonwealth of Massachusetts, as well as this District's Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance for their review and for any and all action as to Chris Kleppin that they deem appropriate.

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTIONS FOR SANCTIONS

McALILEY, United States Magistrate Judge.

Diana Bernal filed this action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq.* (FLSA), in June 2005, claiming that Defendants failed to pay her minimum and overtime wages and her last six weeks of compensation. Defendants filed a motion to dismiss the complaint [DE 19], which was denied [DE 29], and the parties proceeded to discovery.[1] In the parties' Joint Scheduling Report [DE 26], and at subsequent hearings before this Court, Defendants took the position that they never employed Plaintiff and that, in any event, the Defendants were not subject to the FLSA, as they had not engaged in activities that substantially affected interstate commerce.

On December 6, 2005 this Court held a discovery conference[2] noticed by Plaintiff, who sought to compel discovery from Defendants. At the conclusion of a several-hour discovery hearing the Court granted Plaintiff's motion and ordered Defendants to produce various categories of discovery no later than December 12, 2005. [DE 46]. When Defendants failed to fully comply with that order, Plaintiff filed her first motion for sanctions [DE 48] and requested a hearing on that motion. [DE 47]. Although Plaintiff was justifiably frustrated with Defendants' mishandling of their

1. The discovery cut-off was January 20, 2006. [DE 30].

2. Pursuant to the Order Setting Trial Date and Pretrial Deadlines [DE 30], the parties were directed to notice any discovery dispute for the Magistrate Judge's weekly discovery calendar, without first filing any written discovery motions. This procedure is intended to facilitate a quick, inexpensive and effective resolution of discovery disputes.

discovery obligations, the remedy sought by that motion—striking Defendants' answer and affirmative defenses and entering a default judgment on liability—was excessive. Had Defendants' misconduct remained limited to the discovery violations of record at the time Plaintiff filed her first motion, this Court would have denied Plaintiff's motion.

Unfortunately, Defendants' and their attorney's misconduct mushroomed. Defendant Tariq Hussain, with his attorney's advice, continued to engage in discovery violations. Worse, in hopes that the case would be dismissed, Hussain solicited a false affidavit from a third party that made the scandalous accusation that Plaintiff offered that third party $6,000 in exchange for giving false testimony that Plaintiff had in fact worked for Defendants. As it turned out, Plaintiff never sought to bribe the affiant. To the contrary, it was Hussain who offered the affiant a financial incentive in exchange for the false accusatory affidavit.

The Defendants' misconduct multiplied when their attorney, Chris Kleppin, without reasonable inquiry as to the truth of the affidavit, filed it with the Court in his response to the motion for sanctions and relied on it to urge this Court to deny that motion and further, to "severely sanction" Plaintiff and her counsel. In the process Kleppin also improperly threatened to seek sanctions against Plaintiff and her attorney under Federal Rule of Civil Procedure 11. Further, Kleppin issued highly improper discovery requests to Plaintiff in an obvious attempt to intimidate Plaintiff and her counsel into dismissing the lawsuit. As these events unfolded, Defendants continued to violate their discovery obligations.

In light of the wide-ranging nature of Defendants' and Kleppin's misconduct, and the seriousness of the recommended sanctions, this Court undertakes a very careful review of the record.

## I. Background

At all material times Defendant Hussain was the owner of the five corporate defendants. Hussain operated those businesses out of an office in Sunrise, Florida. All American Investment Realty, Inc. was a real estate brokerage firm, and All American Mortgage Bank, Inc., was a mortgage company. LTDS Petroleum, Inc., LTDAS Petroleum, Inc., and LaBelle Petroleum, Inc. operated gas stations in South Florida.

In her Complaint, Plaintiff alleged she was employed by the Defendants from February 2003 until April 1, 2005. [DE 1, ¶ 13]. Plaintiff claimed that her duties were clerical or secretarial in nature, and that she reported directly to Hussain and regularly worked more than 40 hours a week, but was paid a flat $200 in cash weekly. [DE 1, ¶¶ 17–21]. In their Answer Defendants denied, among other things, that Plaintiff ever worked for Defendants and that this Court had subject matter jurisdiction over this matter. [DE 33].

### A. The December 6, 2005 discovery conference[3]

Plaintiff sought the Court's intervention on a number of discovery issues at the December 6, 2005 discovery conference. Some of those discovery issues are recounted here.

As Plaintiff's counsel explained at that conference, his discovery demands mostly focused on two issues: (1) whether Plaintiff had in fact worked for Defendants and

---

**3.** The transcript of that hearing is filed with the Court. [DE 56].

(2) whether Defendants were covered by the FLSA. [DE 56, p. 8]. Thus, in her request for production number 1, Plaintiff requested any evidence that Defendants had paid money to Plaintiff. [DE 56, p. 9]. In their October 12, 2005 response, Defendants Hussain and All American Investment Realty responded that they had two cancelled checks, for $500 and $750, that they would produce at a "place and time mutually convenient to the parties." [DE 56, pp. 10–11].[4] Plaintiff's counsel wrote Kleppin on two occasions[5] and had at least one telephone conversation asking to be sent a copy of promised discovery, including the two checks. [DE 73, n. 9]. Approximately one hour before the December 6, 2005 discovery conference, defense counsel faxed a copy of those two checks to Plaintiff's counsel. [DE 56, pp. 9, 11–13]. At the discovery conference, the Court advised Kleppin that a nearly two-month delay in producing two checks—and the eleventh-hour production only when a hearing had been set—was unacceptable. *Id.*

In document request number 3, Plaintiff sought all loan applications or requests for appraisal of real property Defendants processed for clients. [DE 56, p. 13]. Plaintiff alleged that as part of her duties for Defendants, she assisted in preparing these documents for clients of the real estate brokerage firms, and that those documents she worked on should bear her name. [DE 56, pp. 13–14]. Plaintiff

wished to inspect these documents to see if she might identify any with her name, thereby supporting her claim that she had worked for Defendants. [*Id.*].

All Defendants responded with blanket objections; Defendant Hussain provided a supplemental response that he did not have any responsive documents. [DE 56, p. 14]. Doubting there were no responsive documents, Plaintiff raised the issue at the discovery conference. Kleppin responded that he had directed Hussain to look through the documents for any that had Plaintiff's name, as he believed only they were relevant. [DE 56, p. 15]. He argued that documents without her name should not be produced because they contained confidential information. [DE 56, pp. 15–16].

As it turns out, the morning of the discovery conference Hussain brought the requested files to his lawyer's office. [DE 56, p. 16]. It was thus clarified that Hussain's supplemental response that he had no responsive documents was false. Apparently he had given this response at the direction of Kleppin, who unilaterally narrowed the document request to only those documents with Plaintiff's name.[6] At the discovery conference the Court ordered that no later than December 12, 2005 Plaintiff's counsel be given access to all loan applications and requests for appraisal. [DE 56, pp. 19–20, 39; DE 46, ¶ 1].

---

4. The interrogatories, requests for production and responses addressed at the December 6, 2005 discovery conference were attached as Exhibit 7 to the Judge's copy of Plaintiff's initial motion for sanctions. [DE 48]. Because the discovery requests were directed to each of the five corporate Defendants and to Hussain individually, and therefore were repetitive and voluminous, Plaintiff did not file Exhibit 7 with the Court. For completeness of the record, this Court has made those discovery documents a part of the record. [DE 107].

5. *See* correspondence dated October 19, 2005 and November 7, 2005, attached as Exhibit 11 to DE 73.

6. It would have been an appropriate response to the discovery request (although not necessarily one that would have prevailed) to specifically object to the production of documents that did not have Plaintiff's name. Defendants and their lawyer did not make this distinction, and thus led Plaintiff to believe that no loan applications or requests for appraisal existed.

Interrogatories were issued to all corporate Defendants asking for their gross revenue for the past four years.[7] These interrogatories were directly relevant to the Defendants' assertion that they were not subject to enterprise coverage under the FLSA.[8] After making boilerplate objections,[9] each corporate defendant responded: "The Defendant's gross revenue was less than $500,000 in each of the last four years." [DE 107]. Hussain signed each of these interrogatory responses. Although these interrogatories asked each Defendant to explain how it arrived at its answer, including its calculations, no such information was provided in their responses.

In a related document request, number 8, Plaintiff asked each corporate Defendant for its tax returns for the prior four years. [DE 107]. Again, that inquiry was met with boilerplate objections and the contention that tax returns should not be produced because they are confidential. [DE 107]. At the discovery conference, Kleppin repeatedly advised the Court that his clients insisted they had each earned annual gross revenues of less than $500,000 for the years in question, and therefore were not subject to enterprise coverage under the FLSA, implying that they should not have to produce their returns. [DE 56, pp. 23, 27; DE 83, pp. 17–18]. The Court ordered Defendants to produce the tax returns. [DE 56, pp. 29–31; DE 46, ¶ 2].

In a number of different discovery requests Plaintiff sought any documents that bore Plaintiff's name or referred to Plaintiff. These requests sought to explore Defendants' denial that Plaintiff worked for them. Other than the two cancelled checks, Defendants denied the existence of any responsive documents.[10]

7. Defendant Hussain served an unverified response to his interrogatories on October 12, 2005; it was not until the night before the discovery conference that the corporate defendants served any response, and Hussain served a verified response. [DE 56, pp. 40–43]. The Court admonished Defendants for this and other unjustified delays in meeting their discovery obligations. [DE 56, p. 43].

8. The FLSA's overtime compensation requirements apply to employees who are either (1) "engaged in commerce or in the production of goods for commerce" (individual coverage), or (2) "employed in an enterprise engaged in commerce or in the production of goods for commerce" (enterprise coverage). 29 U.S.C. § 207(a)(1).

"Commerce" means "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C.A. § 203(b).

An "enterprise engaged in commerce or in the production of goods for commerce" means an employer that:

(A)(I) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000....

29 U.S.C. § 203(s)(1).

Defendants repeatedly asserted that Plaintiff (had she worked for Defendants) was not engaged in commerce or in the production of goods for commerce (such that Defendants were not subject to the FLSA's individual coverage), and that they were not subject to the FLSA's enterprise coverage, because their annual gross revenues were less than $500,000. Defendants also appeared to argue that they did not engage in "commerce" as defined by section 203(b) because their activities were within South Florida and thus purely intrastate.

9. At the December 6, 2005 discovery conference, the Court warned Defendants and Kleppin that their use of boilerplate objections was unacceptable. [DE 56, pp. 33–34].

10. See e.g., Hussain's November 9, 2005 response to Plaintiff's Second Set of Interrogatories. [DE 107]. In response to requests for

Following the December 6, 2005 discovery conference, the Court issued a written order memorializing its *ore tenus* orders entered at the conference, and establishing December 12, 2005 as the deadline for compliance. [DE 46]

### B. Plaintiff's initial motion for sanctions

On December 15, 2005, Plaintiff filed a notice of, and requested a hearing on, Defendants' non-compliance with orders issued at the discovery conference. [DE 47]. Plaintiff also filed a Motion to Strike Defendants' Answer and Affirmative Defenses as Sanctions. [DE 48].[11] In that motion, Plaintiff urged this Court to invoke its inherent authority to sanction Defendants for their failure to meet discovery obligations.

Plaintiff specifically complained that Defendants' repeated assertions that their annual gross income for the past four years was less than $500,000 had been proven false, at least in part. Specifically, on December 12, 2005, the corporate Defendants produced tax returns for 2002 and 2003; LTDS Petroleum, Inc.'s tax returns for those two years reflected gross annual income in excess of $500,000. [DE 48, p. 5]. In further contradiction to these tax returns, in a supplemental interrogatory answer served *the same day*, LTDS Petroleum Inc. swore that its gross revenue was less than $500,000 for those same years. [DE 48, p. 6]. Plaintiff argued that the production of these tax returns established

admissions served by Plaintiff on August 30, 2005, Defendants denied possession of any documents that referred to Plaintiff. [DE 48, pp. 7–8].

11. The following day, December 16th, Defendants filed a Notice of Compliance with Discovery Order stating that due to "inadvertence" they had not produced all documents by the December 12th deadline, but that they were now in compliance. [DE 49].

that LTDS Petroleum, Inc., and Hussain as its principal, misled this Court and Plaintiff on this central issue.

Plaintiff's motion for sanctions also focused on Defendants' repeated denials that they possessed any documents with Plaintiff's name, as subsequent discovery had proven this false.[12]

One of the many orders issued at the December 6, 2005 discovery conference compelling the production of discovery directed Defendants All American Investment Realty and All American Mortgage Bank to identify each HUD–1 statement in their possession created between October 1, 2002 and May 2005. [DE 46, ¶ 6; DE 56, pp. 53–57]. In response, All American Investment Realty produced a list of persons for whom it had HUD–1 statements, including two bearing Plaintiff's name. [DE 48, p. 9; Ex. 4]. Thus, in her initial motion for sanctions, Plaintiff correctly argued that the revelation of those two documents established the falsity of All American Investment Realty's earlier sworn statements that it had no documents bearing Plaintiff's name.

Relying on these instances of discovery misconduct, Defendants' repeated use of blanket and bad-faith objections, and what Plaintiff characterized as a general pattern of discovery abuses, Plaintiff asked this Court to sanction Defendants by entering a default judgment on liability.

12. In multiple discovery responses Defendants denied the existence of any documents that made any reference to Plaintiff, with the exception of the two cancelled checks. The various discovery requests that sought these documents, and the responses in which Defendants made these denials, are summarized in Plaintiff's motion. [DE 48, pp. 7–9].

## C. Defendants' memorandum in response

Defendants' response to Plaintiff's motion for sanctions ("response") ventured well beyond the discovery issues raised in Plaintiff's motion. It falsely accused Plaintiff of serious criminal conduct, and accused her lawyer of unethical conduct. Defendants also threatened to seek Rule 11 sanctions against Plaintiff and her counsel, and urged the Court to sanction them both.

Kleppin authored the response. [DE 66, p. 48]. He characterized Plaintiff's motion as being "filed in bad faith, and warrant[ing] that the *Plaintiff and her counsel both be severely sanctioned.*" [DE 50, p. 2] (emphasis added). Using contorted reasoning that lacks any support in the record, Kleppin characterized Plaintiff's motion as a "preemptive strike to the filing of a Rule 11 Motion by the Defendants, because the Defendants recently came into the possession of two important pieces of evidence": (1) a transcript of a message left on Hussain's home answering machine by Plaintiff's husband, Rizwan Ahmed, in which he "threaten[ed] to seriously harm Hussain" and (2) the affidavit of Mohammad J. Khan, which was attached as an exhibit to the memorandum. [DE 50, pp. 2–3]. As Kleppin explained in the response, Khan, in his affidavit, accused Plaintiff of attempting to bribe Khan to falsely testify that Plaintiff had in fact worked for Defendants. [DE 50, p. 3]. Kleppin wrote: "It is obvious, in light of such evidence, that the Plaintiff is seeking a default judgment through a sanctions motion, so that the Plaintiff does not have to confront such evidence." [DE 50, p. 3].

### 1. The Khan affidavit

While there is much about Defendants' response that is objectionable, the filing of the Khan affidavit, and the manner in which Kleppin urged the Court to act upon that affidavit, causes the greatest concern.

The two-page affidavit, dated December 8, 2005, consists of three paragraphs. The first is rather typical: Khan swears that the statements are "true and correct to the best of my knowledge, and I have personal knowledge of the statements made herein." [DE 50, Ex. 2, ¶ 1].

In the second paragraph Khan states he has known Hussain for about two years. He states that on one occasion, in May, 2004, he was in Hussain's office for a mortgage transaction, at which time Plaintiff was also present. While there Khan "expressed anger toward Mr. Hussain because of the interest rate and terms in one of the documents." Khan also had a conversation with Plaintiff about Pakistani clothing and food. [DE 50, Ex. 2, ¶ 2]. The final paragraph reads, in its entirety:

I have never seen or spoken to Diana Bernal until she called me on my telephone approximately last week of October, 2005 and then again last week of November, 2005. On both occasions, Diana Bernal inquired whether I was upset with Mr. Hussain. Diana Bernal suggested that Mr. Hussain somehow ripped me off on the business transaction discussed in the preceding paragraph. Bernal further told that Mr. Hussain treated her and Rizwan Ahmed terribly. *Diana Bernal, both times, offered me sum of $6,000 if I were agree in Court to testify that Ms. Bernal was an employee of Mr. Hussain. Both times, Because I am an honest, I declined Ms. Bernal's offer.*[13]

[DE 50, Ex. 2, ¶ 3] (emphasis added). The affidavit was notarized.

---

13. This paragraph is quoted here exactly as it was written.

## 2. The telephone messages

In addition to the Khan affidavit, Kleppin attached to his response a Hindi–to–English translation of a six-minute tape recording. The translator's certificate indicates that the translation was procured by the law firm of Boreth, Ceaser & Kleppin and was completed on December 15, 2005. [DE 50, Ex. 1]. In his response, Kleppin states that the translations are of messages left by Ahmed (Plaintiff's husband) on Hussain's telephone answering machine. [DE 50, p. 2]. The translation does not identify the speaker or recipient, nor does it identify a date when the telephone messages were purportedly recorded. [DE 50, Ex. 1].[14] The messages are angry and consist mostly of very crude language. In his memorandum Kleppin quotes the transcript at some length and states: "these messages were left shortly after Mr. Hussain informed Mr. Ahmed that he was no longer going to utilize his services as an independent contractor because of what Mr. Hussain describes as illegal and unethical business dealings that Mr. Ahmed was engaging in; the transcript clearly shows a man [Plaintiff's husband] who is completely bent on revenge and guided by unbridled hate...." [DE 50, pp. 2–3].

Kleppin asserted that Plaintiff's counsel, Dion J. Cassata had at one time admitted that Plaintiff's husband left these voice mail messages, but later retracted that admission. [DE 50, p. 3].[15] Kleppin then asked:

Undersigned counsel requests that the Court simply hold an evidentiary hearing in which it hears the audiotape of the threatening messages on the answering machine and hears the voice of Mr. Ahmed at the hearing, and compare [sic] the voice on the tape to the voice of Mr. Ahmed, and determine [sic] whether he indeed left the message.

[DE 50, p. 3]. The Court declined to engage in this voice comparison. [DE 55, ¶ 3].

## 3. The discovery issues

After this discussion of the telephone messages and Khan's accusation of bribery, the memorandum turned to a review of the underlying issues in the case. [DE 50, pp. 3–5]. It stated that Hussain ran his real estate and mortgage companies out of his Sunrise, Florida office, but that none of his petroleum companies conducted any business from that office. It further stated that Hussain did not meet Plaintiff until late 2003 (later than when Plaintiff claims she began her employment with Defendants), when Plaintiff's husband, Ahmed, began to work as an independent contractor for Hussain's two real estate companies. During this time Ahmed was often present in Hussain's office, where Plaintiff would visit several times a week and bring lunch to her husband. Ahmed worked with Hussain until May 2005, when Hussain ended the relationship:

Mr. Hussain had to end the relationship between Mr. Ahmed and him because of what Mr. Hussain describes as illegal and unethical practices of Mr. Ahmed with respect to real estate transactions. Once Mr. Hussain informed Mr. Ahmed

---

**14.** The Court later learned that the tape recordings were made in May, 2005, approximately one month before the filing of this lawsuit. [DE 66, pp. 41, 44].

**15.** At a later hearing, Cassata advised the Court that Ahmed acknowledged leaving the "profane and ... angry" messages. [DE 66, p. 145]. Ahmed disputed much of the translation; in particular he denied making any allegation that Hussain sexually harassed or abused Plaintiff, and denied that he threatened to harm Hussain. [DE 66, pp. 145–46].

that he could no longer utilize his services, Mr. Ahmed became enraged and violent, leaving the expletive-filled, threatening messages described above. It is Mr. Hussain's assertion that Mr. Ahmed is behind the filing of the instant lawsuit, and the intention of the lawsuit is to extract revenge on Mr. Hussain. [DE 50, pp. 4–5]. According to Hussain, Plaintiff performed "two incidents of casual labor for one of the 'All American' companies for $500 and $750, in late 2004," which is documented by the two cancelled checks produced in discovery. [DE 50, p. 5]. Otherwise, Hussain claimed, Plaintiff never worked for Defendants.

After laying this and other brief groundwork as to the "facts" of this case, Kleppin turned to the discovery issues at hand. [DE 50, p. 5]. As for the two belatedly produced HUD–1 forms bearing Plaintiff's name, Kleppin noted that none of the other documents produced by Defendants bore Plaintiff's name. [DE 50, p. 6]. Further, the two documents with Plaintiff's name were prepared for a real estate transaction Plaintiff had engaged in for her own benefit, and thus were not evidence that she was employed by Defendants. [DE 50, p. 7]. Kleppin assumed responsibility for the non-production of the HUD–1 forms when he wrote "Mr. Hussain was instructed by undersigned counsel that the relevant forms to this case were those that could possibly show that Plaintiff worked for him...." [*Id.*]. Kleppin nevertheless acknowledged that "technically" the HUD–1 forms fall under "a very broad discovery request." [DE 50, p. 7]. He characterized Defendants' failure to timely produce these two documents as an "oversight, because the focus of the case was on documents

showing Plaintiff worked there" [DE 50, p. 8], and argued that the sanctions sought by Plaintiff were excessive for such a discovery violation.

As for the 2002 and 2003 LTDS Petroleum, Inc. tax returns that showed gross revenues in excess of $500,000, Mr. Hussain "apologize[d] about being wrong about the one gas station's gross revenue." [DE 50, p. 8]. Responding to Plaintiff's call for sanctions, Kleppin made several arguments all to the effect that, in the end, this evidence would not show Defendants are covered by the FLSA, and again argued that the sanctions sought were far too harsh. [DE 50, pp. 8–9].[16] Then returning to his original theme, Kleppin wrote:

> The Plaintiff's Motion is completely without merit, and its filing warrants that the *Plaintiff and her counsel be sanctioned.* The Plaintiff's Motion is filed in bad faith for several reasons: 1) the actual discovery abuses that the Plaintiff portrays are either false, disingenuous, or grossly exaggerated; and 2) the existence of evidence which tends to show that the Plaintiff has ulterior bad faith motives to bring the lawsuit.

[DE 50, p. 9] (emphasis added). In a further attack on Plaintiff's counsel, Kleppin wrote:

> In this case, the Defendants did not do anything that warrants sanctions, but rather the discovery violations, the accusations of perjury, lying, and so forth are completely overblown, grossly exaggerated, *or fabricated by Mr. Cassata.*

[DE 50, p. 13](emphasis added).[17]

Kleppin then put forth an analysis of enterprise and individual coverage under

---

**16.** The response contained more argument about various aspects of discovery disputes between the parties, none of which is neces-

sary to this analysis. [*See, e.g.,* DE 50, pp. 9–11].

**17.** In contrast, Kleppin later explained his delays in producing discovery as caused by "a

the FLSA. [DE 50, pp. 14–17]. He concluded that the Defendants are not "engaged in interstate commerce" [18] and that Plaintiff did not work for the one defendant gas station that at that point had been shown to have reported gross revenues in excess of $500,000 for a two-year period. Kleppin wrote:

> Undersigned counsel, *as part of the Rule 11 process,* asked Mr. Cassata to explain how the Plaintiff worked for the gas station 35 miles away, and he refused to respond to that letter. *The Defendants are not filing that letter with the Court because the 21–day period has not yet elapsed.* Accordingly, Plaintiff cannot establish enterprise coverage. Therefore, there is no subject matter jurisdiction over this matter.

[DE 50, p. 17](emphasis added).

### 4. The conclusion

Kleppin concluded his response memorandum with this paragraph:

> While discovery is certainly not over, and Mr. Khan is set for deposition in early January, 2006, and will certainly be vigorously examined by Plaintiff's counsel, and while Plaintiff has denied the allegations contained in Mr. Khan's Affidavit, and while neither undersigned counsel nor Mr. Cassata can say for sure who is lying and who is telling the truth because neither one of them were in the Sunrise, Florida business office at the relevant times, it appears from the evidence adduced thus far that it is not Mr. Hussain who is the dishonest party. It

hardly seems to be coincidental that the Plaintiff would file the instant Motion the day that her counsel learns of the transcript of the tape-recorded messages and the Affidavit of Mohammad J. Khan. It appears that this Motion was filed with the Court *as a preemptive strike to a filing of a sanctions motion by the Defendants,* and to obfuscate the glaring lack of subject matter jurisdiction as set forth [in this memorandum].

[DE 50, p. 18](emphasis added). As is explained below, Khan's bribery accusation was false, Kleppin had no reasonable basis to state "it is not Mr. Hussain who is the dishonest party," and Kleppin's threat of Rule 11 sanctions was baseless, as was his assertion that Plaintiff's motion was a "preemptive strike to a filing of a sanctions motion by the Defendants."

### D. Kleppin's abusive discovery requests

As this Court later learned, before Cassata represented Plaintiff in this case he was employed by defense counsel—he was an associate at Glasser, Boreth, Cesar & Kleppin from October 2003 until February 2005. [DE 51, p. 2 n. 2]. In May, 2005, three months after his departure from the firm, Plaintiff contacted and retained Cassata as her attorney. [DE 51, p. 4 n. 6]. Cassata, on behalf of his newly constituted law firm, filed this lawsuit in June, 2005.

Plaintiff faxed her initial motion for sanctions to defense counsel on Thursday December 15, 2005.[19] The following Mon-

---

number of professional commitments," the "lingering effects of Hurricane Wilma" and the fact that he "had hardly taken a vacation in the past seven years and simply needed one." [DE 50, p. 13]. He described his schedule as "grueling" and said he was "physically, mentally, and emotionally exhausted." [DE 66, p. 17].

**18.** It is worth noting that Defendants' current counsel has withdrawn this defense, which he characterized as "spurious." [DE 100, pp. 3, 9–10].

**19.** After the first few pages were received, the facsimile transmission failed. Kleppin was nevertheless aware on December 15th of the relief sought. The entire pleading was faxed

day, Kleppin issued this interrogatory to Plaintiff:

Did your lawyer, Mr. Cassata, ever copy the hard-drive or transfer the hard-drive of Mr. Kleppin's computer onto some sort of disc or CD–ROM, at any time during or after Mr. Cassata's employment with Mr. Kleppin's law firm?

[DE 51, p. 4, Ex. 2]. In addition, Kleppin issued the following requests for admission:

1. Admit or deny that Mr. Cassata transferred or copied the information on Mr. Kleppin's computer hard-drive onto another hard-drive during or after his employment with Mr. Kleppin's law firm.

2. Admit or deny that Mr. Cassata transferred or copied the information on Mr. Kleppin's computer hard-drive onto some sort of disc or CD-rom, at any time during or after his employment with Mr. Kleppin's law firm.

3. Admit or deny that Mr. Cassata transferred or copied the information on Mr. Kleppin's computer hard-drive and that he has the information that was contained on that hard-drive at a point in time in his possession, custody, or control.

4. Admit or deny that Mr. Cassata, when he worked for Mr. Kleppin, asked him on more than one occasion if he could have access to Mr. Kleppin's computer database.

[DE 51, p. 4, Ex. 3]. Plaintiff brought this discovery to the attention of the Court in her reply in support of her initial motion for sanctions. [DE 51]. After inquiry at a hearing on January 12, 2006 [DE 83, pp. 75–90], the Court issued a protective order

directing Plaintiff not to respond to this discovery. [DE 83, p. 84, DE 63, ¶ 6].

In response to the Court's questions about the propriety of these inquiries, Kleppin said: "I don't know what the big deal is." [DE 83, p. 81]. By way of explanation, Kleppin stated that a motion by Plaintiff for entry of a default judgment, filed early in the case after Defendant had been tardy in responding to the Complaint, was identical to motions for default Kleppin had drafted. [DE 83, p. 77]. The same was true for the complaint, according to Kleppin, and for a subpoena issued by Plaintiff. [DE 83, pp. 77–78]. Kleppin said it was an obvious "copy and paste job." [DE 83, p. 78]. Kleppin further relayed that when he served the Complaint, Cassata sent a settlement demand that sought attorneys' fees in an amount Kleppin believed excessive. [DE 83, pp. 75–78]. If Cassata admitted to taking copies of pleadings when he left Kleppin's law firm, Kleppin reasoned, the Court might find that Cassata simply copied Kleppin's pleadings, and reduce the time and corresponding fees Cassata claimed for drafting those pleadings. [DE 83, p. 80]. Thus, Kleppin argued, these questions were relevant to a claim of attorneys' fees by Plaintiff, in the event she later prevailed in the lawsuit.

Plaintiff however, was far from prevailing in the lawsuit. At that point little, if any, documentation had been produced to prove she worked for any Defendant, and Defendants continued to argue vociferously that they were not even subject to the FLSA and that the lawsuit was baseless. Thus, when the discovery was served, Plaintiff's recovery of attorneys' fees was not an issue; Kleppin's inquiry had nothing to do with the merits of the lawsuit.[20]

again to defense counsel the following day. [DE 66, pp. 30–31, 35–36, 140–41].

20. Even if we were to believe that Kleppin's sole reason for issuing these discovery requests was to respond to an anticipated mo-

More to the point, Plaintiff could not have known whether her attorney, months before she met him, took copies of documents when he left his former employer. Kleppin acknowledged as much, stating: "I think she could get that knowledge from her attorney." [DE 83, pp. 79, 85].

Kleppin's timing in issuing this discovery cannot be overlooked. He did so immediately after Plaintiff filed her motion for sanctions and coincidental with his letter threatening Cassata with Rule 11 sanctions—but many months after Cassata's allegedly inflated settlement demand. When asked, Kleppin denied that the discovery was a response to Plaintiff's sanctions motion, and explained that he was "simply procrastinating" in conducting discovery. [DE 83, p. 84].

This Court can conclude only that Kleppin's inquiries were designed to intimidate both Cassata and Plaintiff. The clear message was that Kleppin and his law firm believed Cassata had taken documents from the firm without its authorization, possibly even after Cassata left that firm.[21] These questions strongly suggest Kleppin's firm might bring legal or ethics charges against Cassata. By putting these inquiries in the form of discovery requests to Plaintiff, the clear intent was to make Plaintiff aware of these accusations. The Court can conceive of no purpose for making Plaintiff aware of this other than to intimidate her, and her lawyer, from vigorously prosecuting her lawsuit.

In sum, Kleppin's discovery requests sought information beyond the scope of this lawsuit and beyond Plaintiff's personal knowledge. He clearly misused the discovery rules to suggest to Plaintiff that her attorney engaged in illegal or unethical conduct in a matter entirely unrelated to this lawsuit.

### E. Kleppin's "Rule 11 letter"

As already noted, in his response to the initial motion for sanctions Kleppin stated he was prepared to file a motion for sanctions under Rule 11 against Cassata.[22] ("The Plaintiff has filed this Motion as a *preemptive strike to the filing of a Rule 11* Motion by the Defendants...." [DE 50, p. 2]. "Undersigned counsel, *as part of the Rule 11 process,* asked Mr. Cassata to explain how the Plaintiff worked for a gas station 35 miles away, and he refused to respond to that letter. The Defendants are not filing *that letter* with the Court because the 21–day period has not yet elapsed." [DE 50, p. 17](emphasis added)). At a later hearing, Kleppin confirmed that, by making these statements in his response memorandum, he advised the Court and Plaintiff he would file a motion for sanctions under Rule 11. [DE 66, pp. 58–60, 78].

The letter referred to in Kleppin's response was written by Kleppin to Cassata on December 16, 2005, the day after Kleppin received Plaintiff's initial motion for sanctions. [DE 66, pp. 141–42; DE 51, Ex. 1]. The letter began with Kleppin's

---

tion for attorneys' fees, the inquiry remains gratuitous. In challenging the time claimed by Cassata in drafting pleadings, the question would be whether Cassata had pleadings, from any source, from which he could borrow language and thereby shortcut the drafting process. Whether his exemplars came from Glasser, Boreth, Cesar & Kleppin, or somewhere else, would be unimportant.

21. The final request for admission further suggested that Kleppin would testify that Cassata had asked for access to Kleppin's computer database, and given this line of questions, it would be a reasonable inference that Kleppin would state he had turned down that request.

22. Kleppin never explicitly identified against whom he would seek sanctions, Cassata or Plaintiff.

request that Cassata dismiss the lawsuit "because the Plaintiff cannot establish either individual coverage or enterprise coverage." [DE 51, Ex. 1, p. 1]. The request was followed by the reasons Defendants had already put forth, on a number of occasions, in support of this position. Next, the letter referred to and quoted the voice mail messages left by Plaintiff's husband on Hussain's answering machine. Finally, the letter advised Cassata of the Khan affidavit. It quoted the bribery accusation in the affidavit and then stated:

> It is obvious that Ms. Bernal never worked for the Defendants, and that your latest attempt to obtain a judgment in your favor as to liability as a sanction because Mr. Hussain listed in an interrogatory that all five of his businesses were under the $500,000 gross revenue figure for the last three years (when one of them was barely over the figure for one year), *shows that you are complicit in Ms. Bernal's fabrications.*
>
> We intend to file a Rule 11 motion if you do not dismiss the lawsuit.

[DE 51, Ex. 1, p. 2](emphasis added).[23]

Kleppin, in a letter to Cassata dated December 19, 2005, again threatened to file a Rule 11 motion. ("Naturally, based on the Rule 11 letter, you should continue

to do whatever investigation is necessary and bring to my attention any information you may have obviate [sic] the need for the Rule 11 Motion."). [DE 73, Ex. 22].

Kleppin never specifically identified for Cassata the representations supposedly made in violation of Rule 11. Further, he never sent Cassata a draft motion for sanctions as contemplated by the Rule,[24] nor has he filed one with the Court. [DE 66, p. 142].

### F. Evidentiary hearings concerning the Khan affidavit

After receiving Plaintiff's initial motion for sanctions, Defendants' response and Plaintiff's reply, this Court *sua sponte* noticed Hussain, Khan and Kleppin for a hearing to address the circumstances surrounding the filing of the Khan affidavit. [DE 55, 72]. Hussain and Kleppin testified on January 19, 2006.[25] [DE 66]. Khan testified on February 17, 2006. [DE 106].[26] The testimony pertinent to this Report and Recommendation is summarized below.

### 1. Chris Kleppin

Kleppin testified that sometime during the week of December 5, 2005, Hussain called him by telephone and advised that

---

**23.** Kleppin's accusation that Cassata was "complicit in Ms. Bernal's fabrications," implies that Cassata was in some fashion a knowing participant in his client's alleged criminal conduct. The accusation is ambiguous enough (perhaps this was deliberate) to have a number of meanings. Regardless of how Kleppin would explain his accusation, this personal attack on opposing counsel was mean-spirited and completely unnecessary. This Court has undertaken a painstaking review of the record and finds no support for Kleppin's accusation or its implications about Cassata. In this, and other instances, Kleppin deviated far from the professionalism expected of members of this bar.

**24.** Rule 11(c)(1)(A), Fed.R.Civ.P.

**25.** The Court did not place Kleppin under oath but did advise him that it considered his testimony "the equivalent of being under oath." [DE 66, p. 2]

**26.** The Court directed Khan to appear on January 19, 2006. [DE 55, ¶ 2]. He did so and told the Court he had been advised by an attorney to assert his Fifth Amendment privilege in response to questions about the affidavit. Khan, however, was not represented by that attorney, and the Court appointed the Federal Public Defender to represent him. [DE 78]. Khan reappeared, with his appointed counsel, on February 17th.

Khan had called and reported that Plaintiff had twice offered to pay Khan if he would falsely testify that Plaintiff had worked for Defendants. [DE 66, pp. 3–5]. Although Kleppin does not recall the details of that conversation, he did recall Khan alerting him that he had "some sort of bombshell evidence." [DE 66, pp. 5–6]. Later that same week, Hussain met Kleppin at his office. [DE 66, pp. 3, 7]. The meeting lasted for 20 to 30 minutes; no one else was present. [DE 66, pp. 8, 18]. The two had a "detailed" conversation about what Khan reportedly said over the phone. [DE 66, pp. 7–8]. Hussain relayed essentially all the information contained in the affidavit. [DE 66, p. 9]. Kleppin asked his client how he knew Khan. Hussain said "something about a loan refinancing" sometime in 2004 which apparently did not go through. [DE 66, pp. 18–19]. Hussain also reported that he had not spoken to Khan in a long time, possibly more than a year. [Id.]

Kleppin has never spoken with Khan. [DE 66, pp. 5, 8].[27] He told his client that he wanted to take Khan's deposition and "see what he's going to say." [DE 66, p. 10]. Hussain responded that he did not want to do that, and suggested they have Khan "sign something under oath." [DE 66, pp. 11–12]. Although Kleppin did not remember his client's explanation for not wanting Khan deposed, he did recall some concern expressed in the past that certain witnesses did not want to get involved with the lawsuit. [DE 66, pp. 12–13, 22]. The question was resolved when Hussain said "he's going to get this affidavit from Mr.

Khan." [DE 66, p. 13]. Kleppin further explained:

> He said, well one way or the other I want that affidavit from him. Mr. Hussain all along has been very adamant that Ms. Bernal never worked for him. He's very anxious to prove this.
>
> So far there's been considerable attorneys fees in this case and so forth, and so really of all the cases that I have had and defended, more than—and believe me I have had anxious people on both sides, representing both plaintiffs and defendants, in this case the level of anxiety was great on behalf of Mr. Hussain. There is serious bad blood between Mr. Hussain and Ms. Bernal and Ms. Ahmed. Under the circumstances, he really wasn't going to take no for an answer.
>
> So I actually typed it up, with him telling me what Mr. Khan had said over the telephone, I typed up a draft affidavit, on my computer.[28]

[DE 66, p. 14]. Kleppin described Hussain in this way:

> I think he was in a hurry to get this before the Court. Just anything we can do with respect to the fees that I'm paying, to show the other lawyer, you know, let's push this to the floor to resolve this.

[DE 66, p. 15]. Hussain left Kleppin's office with the intent to have the affidavit signed.[29] Despite the circumstances surrounding Hussain's disclosure of this information, Kleppin had no doubts about the truthfulness of what his client had told

---

27. The first time Kleppin ever saw or heard from Khan was when Khan appeared at the January 19, 2006 hearing. [DE 66, p. 5].

28. In a later-filed memorandum of law, Kleppin stated that his computer records indicate that he drafted the Khan affidavit on December 5, 2005. [DE 94, p. 8, n. 8].

29. In an apparent contradiction, Kleppin testified that he did not think Hussain left that meeting with a copy of the draft affidavit. [DE 66, p. 16]. Yet Kleppin understood that when his client left his office, he intended to have the affidavit signed. [DE 66, p. 17].

him, as he believed his client had been truthful with him up to that point. [DE 66, pp. 20–21].

Later, sometime after December 12th, Hussain delivered the finalized affidavit to Kleppin's office. [DE 66, p. 24]. Kleppin thought that this affidavit, together with other actions of Plaintiff and her husband, might merit dismissal of the lawsuit. [DE 66, pp. 26–28]. Kleppin began to draft a motion to dismiss the complaint. [DE 66, p. 26].

Kleppin called Cassata on Thursday, December 15, 2005 and told him the substance of the Khan affidavit. [DE 66, pp. 30–32, 34, 139–40; DE 73, Ex. 20]. He also told Cassata he had a transcript[30] of the recorded voice mail messages.[31] [DE 66, pp. 33–34]. Cassata said he would discuss the accusation in the affidavit with his client, and asked Kleppin to fax the affidavit. [DE 66, pp. 139–40].[32] It is undisputed that during this telephone conversation Cassata told Kleppin he had been preparing a motion for sanctions, and identified the discovery issues that were the subject of that motion. [DE 66, pp. 35, 139]. At that point Cassata had nearly completed his motion, and in fact he faxed it to Kleppin later that day. [DE 66, pp. 140–41]. Thus, Kleppin's own testimony contradicts his claim in the response that Plaintiff's motion for sanctions was a "preemptive strike" brought about by Defendants' having "recently"come into possession of the Khan affidavit and telephone transcripts. Kleppin knew that Cassata had nearly completed his sanctions motion when they spoke on December 15th.[33]

The following day, Friday December 16th, Kleppin wrote the "Rule 11 letter" discussed above. [DE 66, pp. 32, 141–42; DE 73, Ex. 18]. The next Wednesday, December 21, 2005, Kleppin filed his response memorandum with the Court, attaching the Khan affidavit.

Between December 15th and the 21st Kleppin and Cassata spoke by telephone about the affidavit. [DE 66, pp. 39]. Cassata reported that his client denied Khan's accusation and proposed that he and Kleppin bring the affidavit to the attention of the U.S. Attorney's Office and the FBI. He further proposed that the parties jointly bring the affidavit to the attention of the Court and ask that the case be stayed pending a criminal investigation. [DE 66, pp. 39, 142–43; DE 73, Ex. 20, 21]. Kleppin responded that any report to the FBI should include other information about the alleged illegalities of Plaintiff and her husband, including the recorded telephone messages, which Kleppin characterized for the Court as threats on Hussain's life. [DE 66, pp. 39–40; DE 73, Ex. 22]. In a letter to Cassata, Kleppin rejected his pro-

---

**30.** Kleppin offered "procrastination" as the reason why he waited months to have the tape recordings transcribed. [DE 66, p. 45].

**31.** Kleppin first told Cassata about the tape recordings on November 9, 2005. [DE 66, p. 44].

**32.** Cassata wrote Kleppin on Friday, December 16th and Sunday the 18th, again asking to see the affidavit. [DE 66, pp. 31–32, 142; DE 73, Ex. 17, 20]. Kleppin faxed the affidavit to Cassata the following Monday, the 19th. [DE 66, pp. 142–43]. Given the incendiary nature of the accusation, and the brevity of the affidavit, there was no excuse for Kleppin's delay in faxing the document to Cassata. Sadly, this was typical of Kleppin's behavior throughout the case.

**33.** This testimony of Kleppin also contradicts his statement, in the response, that "[i]t is obvious ... that the Plaintiff is seeking a default judgment through a sanctions motion, so that the Plaintiff does not have to confront [the] evidence" of the transcript of the telephone recordings and Khan's bribery allegation. [DE 50, p. 3]. Kleppin knew that Plaintiff's sanctions motion was drafted before Plaintiff was informed of this evidence.

posal and wrote "it is my intention to inform the court in an appropriate manner of the affidavit and the tape." [DE 51, Ex. 5].[34]

With this background, on December 21, 2005, Kleppin filed the response memorandum. Kleppin made the decision to make the Khan affidavit part of his response. [DE 66, pp. 48–49]; he believed the Court should have it and the transcribed phone messages. [DE 66, p. 51].[35] He later acknowledged to the Court that he relied on the affidavit, in important part, in asking this Court to sanction Plaintiff and Cassata. [DE 66, p. 79]. He also believed Plaintiff's motion for sanctions had no merit because the discovery his client was accused of withholding was not material to the lawsuit [DE 66, p. 49], the motion "contained falsehoods," and the remedy sought was excessive. [DE 66, p. 50]. Kleppin also explained:

> Frankly as a lawyer I wanted this to lead to a quicker resolution . . . of this case. Whether the quicker resolution is Mr. Hussain loses or wins, hey, this is for the Court—
>
> \* \* \*
>
> Well, it is fair to say that I at that time thought that they would dismiss this possibly or at least ask their client, hey what's going on here? That kind of thing. At least I thought it would lead to a dialog, some discussion, some com-

munication between the lawyers to somehow let's reign this in. What's really happening here.

[DE 66, pp. 51–52]. Kleppin made no effort to meet or speak with Khan before he filed the affidavit with the Court. [DE 66, p. 52].[36] His only thought was to notice Khan for deposition, which he did for January 12, 2006. [DE 66, p. 29]. Kleppin explained that he and his partners believed they should have no communication with Khan before a deposition; otherwise they would be open to criticism that they had somehow influenced his testimony. [DE 66, pp. 53–54]. Kleppin acknowledged, however, that he had no basis to believe that Khan would be cooperative, or show up at a deposition. [DE 66, pp. 82–83].

Kleppin did not consider proposing that he and Cassata immediately arrange to depose Khan, and agree to extend the date for Defendants' response to the sanctions motion until that deposition had been concluded. [DE 66, p. 55]. He also outright rejected Cassata's suggestion that they jointly seek a stay while the bribery allegations were investigated. [DE 73, Ex. 22]. "At that time I had an awful lot of evidence in my possession that I felt that this was a blatant frivolous lawsuit." [DE 66, p. 56]. Kleppin felt justified in filing and relying on the affidavit because he believed Plaintiff to be dishonest. [DE 66, pp. 60–64].[37] When asked to identify the

---

**34.** The following day, December 20, 2005, *before Kleppin had filed the affidavit with the Court,* Cassata reported the accusation to the FBI, but was told the FBI would not conduct an investigation absent the Court's request that it do so. In her reply memorandum, Plaintiff strongly denied the bribery accusation and encouraged the Court to refer the matter to the FBI. [DE 51, p. 9, n. 12].

**35.** Kleppin did not produce a copy of the tape recording to Plaintiff until January 6, 2006. [DE 94, p. 38]. He admitted he should have

disclosed the tape recordings earlier, as part of his Rule 26 initial disclosures. [DE 66, p. 45].

**36.** He also had no reason to believe that Khan knew his affidavit would be filed with the Court. [DE 66, p. 84].

**37.** Kleppin proffered a number of examples of Plaintiff's dishonesty, [DE 66, pp. 62–63, 67–71], and Cassata responded with innocent explanations for her conduct. [DE 66, pp. 71–72, 149–50; DE 97, p. 5, n. 5]. The Court has

evidentiary support he had for Khan's bribery accusation, Kleppin could point only to his belief that Plaintiff was dishonest and that his own client was honorable. [DE 66, pp. 60–64, 67–83].

On January 13, 2006, after Khan had been ordered to appear for testimony, an attorney telephoned Kleppin and said he represented Khan. [DE 66, pp. 56–57, 64–66; DE 60]. According to the attorney, Khan said the bribery allegation against Plaintiff in the affidavit was false, that Hussain had offered Khan favorable refinancing terms in exchange for signing the affidavit and that Khan would assert his Fifth Amendment privilege at the upcoming hearing. [Id.].[38]

### a. Tariq Hussain

Hussain testified that Khan became his client in 2004. [DE 66, p. 85].[39] Hussain, through All American Mortgage Bank, arranged for Khan to refinance his home with a high loan-to-value mortgage worth 110% of the property value. Khan engaged in this transaction in an effort to pay off credit card debt. [DE 66, p. 86]. The transaction was completed in Hussain's office in mid–2004, at which time Plaintiff was present in the conference room. [DE 66, p. 87]. At that time Khan expressed anger at Hussain about the interest rate, which was apparently higher than Khan had expected. [DE 66, p. 88].

Later, in December 2004, or possibly January, 2005, Khan called Hussain to inquire about a second mortgage on his home. That transaction did not take place, as Khan chose instead to take a loan from a credit card company. [DE 66, p. 88].

Aware that Khan's property value had risen, and interest rates had fallen, Hussain called Khan sometime in July, August or September, 2005 and proposed that he refinance his home again. [DE 66, pp. 89–90]. Khan responded that "he'd look into it." [DE 66, p. 93]. Hussain testified that it was during this conversation that he first told Khan about this lawsuit. [DE 66, pp. 90–91].

Hussain testified that he next spoke with Khan in late October, 2005, when Khan called to report that Plaintiff had called him about the lawsuit and "said a lot of things about [Hussain]" that Khan could not relay over the telephone.[40] [DE 66, pp. 91–95]. Khan proposed that they meet. [DE 66, pp. 94–95].

Khan called Hussain again, in the third or fourth week of November, to report that Plaintiff had contacted him again. [DE 66, p. 95]. Khan again asked to meet with Hussain, as he could speak about this only in person. [DE 66, p. 95]. They met for lunch at the India House Restaurant at the end of November or the first week of December, 2005. [DE 66, p. 96]. There Khan reported that Plaintiff, in their tele-

not made an independent inquiry regarding these accusations.

**38.** Kleppin received this call while he and Cassata were in the midst of a deposition, and Kleppin relayed the conversation to Cassata. [DE 66, pp. 64–66, 72–73]. When Kleppin advised the Court of this information, he omitted that part of the statement that his own client unlawfully procured the affidavit. [DE 60; DE 66, p. 57]. Cassata brought this additional information to the Court's atten-

tion. Only then did Kleppin admit he was told this. [DE 66, pp. 65–66].

**39.** Other than Hussain's attending the wedding of Khan's daughter in August 2005, Hussain and Khan were not social friends. [DE 66, p. 89; DE 106, pp. 16–17].

**40.** Hussain testified that he may have had some other phone conversations with Khan when they spoke about the possible refinancing. [DE 66, p. 92].

phone conversations, had reminded Khan of his dispute with Hussain over the interest rate at the 2004 refinancing, and said that Hussain had similarly "ripped off" Plaintiff and her husband by not paying commissions owed her husband. [DE 66, pp. 97–98]. Plaintiff offered that her husband, who was working at another realty company by that time, could arrange to refinance Khan's home, and that they would pay Khan's $6,000 pre-payment penalty fee [41] if Khan would testify that he had seen Plaintiff at Hussain's office and knew she had worked for him. [DE 66, pp. 98–100]. Hussain testified that it was clear, from what Khan said, that Plaintiff was offering to pay Khan for his false testimony. [DE 66, p. 99]. Khan told Hussain he would not accept Plaintiff's offer. [DE 66, p. 100]. Hussain asked Khan if he would put what he had just told him in writing. Khan said he would let him know. [DE 66, p. 100].

At this same lunch meeting Hussain offered to refinance Khan's home at a 6.75% interest rate. Hussain denied that he in any way suggested to Khan that his offer was contingent on Khan's signing an affidavit. [DE 66, p. 101].[42]

Some time after this meeting, Hussain visited Kleppin at his office and relayed what Khan had said.[43] [DE 66, pp. 104–10]. Hussain said he could not recall what Kleppin said at this meeting about Khan's allegations [DE 66, pp. 105–06]; he did recall that Kleppin asked if Khan was truthful. [DE 66, p. 136].

Thereafter, Khan called Hussain and asked for his help locating a bank not far from Hussain's office. They agreed that on December 8, 2005, Khan would drive to Hussain's office and Hussain would accompany Khan to the bank. [DE 66, pp. 107–109]. In anticipation of this visit from Khan, Hussain went to Kleppin's office, where Kleppin drafted an affidavit for Khan. [DE 66, p. 107].[44] Back at his own office, Hussain retyped the affidavit on his computer.

On December 8th, after Hussain accompanied Khan to the bank, they returned to Hussain's office. Hussain showed Khan the affidavit prepared by Kleppin. Khan directed Hussain to make some changes to the affidavit, then signed it. [DE 66, pp. 107–112]. Hussain then took Khan to a notary located in his office building who notarized the document. [DE 66, pp. 113, 151].

Hussain said he told Khan the affidavit would be used in this lawsuit, and would be given to Plaintiff's attorney. [DE 66, pp. 114–15]. Hussain testified he did not know the affidavit would be filed with the Court, and thus did not advise Khan of this. [*Id.*]

**41.** Khan was obligated under the terms of his existing mortgage to pay the $6,000 penalty if he refinanced before 2007. [DE 66, p. 98; DE 106, p. 25].

**42.** Hussain brought a tape recorder and the original tape of the voice mail messages to lunch and played them for Khan. Hussain kept these items in his briefcase and from time to time played the tape for others, so they could hear what was being said about him. [DE 66, pp. 102–03]. Hussain was very upset about what he felt were false and very scandalous accusations that he had sexually abused Plaintiff. [DE 66, p. 102].

**43.** According to Hussain, one of Hussain's clients, Ali Marque, accompanied Hussain to this meeting. [DE 66, pp. 104–105]. After their meeting at the India House Restaurant and before his meeting with Kleppin, Hussain called Khan by telephone three or four times to ask if he would sign an affidavit. [DE 66, pp. 107–08].

**44.** Hussain's testimony about this sequence of events was not clear. [*See* DE 66, pp. 104–113]. At one point Hussain testified that Kleppin prepared the affidavit at the meeting attended by Ali Marque. [DE 66, pp. 109–110].

At the December 8, 2005 meeting, Hussain and Khan also discussed refinancing Khan's home, at which time Hussain gave Khan a good faith estimate [45] of the terms of that transaction. [DE 66, pp. 115–117, 120].[46] Hussain testified that he typed the good faith estimate on December 8, 2005. [DE 66, pp. 120, 122]. However, next to "date prepared" Hussain typed a different date: "11/14/2005." (Hussain testified that he intended to type 12/14/2005 next to "date prepared," but mistakenly dated it one month earlier. [DE 66, p. 121].) Khan also wrote a different date at the bottom of the document next to his signature: "12/16/05." Hussain testified that he and Khan deliberately falsely dated the document to avoid the appearance that Hussain gave the good faith estimate in exchange for Khan's affidavit. [DE 66, pp. 123, 127–28, 130–31].

The good faith estimate prepared by Hussain on December 8th reflected an interest rate of 6.5%. Hussain confirmed that at their lunch meeting he quoted Khan the higher rate of 6.75%. [DE 66, pp. 124, 129]. Refinancing at 6.5% would reduce Hussain's commission by about $1,000. [DE 66, pp. 125–26, 131]. Hussain denied that he offered the lower interest rate as a quid pro quo for the affidavit. [DE 66, p. 131].

Hussain testified that he telephoned Kleppin to report that he had received the affidavit. He later brought it to Kleppin's office. [DE 66, pp. 131–33]. Kleppin said he would give the affidavit to Cassata, but did not indicate he would file it with the Court. [DE 66, pp. 133, 135–36]. Hussain denied having further discussed the affidavit with his lawyer. [DE 66, p. 136].

### 2. Mohammed J. Khan

Khan is from Pakistan, where he received a legal education; he is now employed as a taxicab driver. [DE 106, pp. 36–37]. Khan testified that he first met Hussain in June or July of 2004, when Hussain agreed to handle the refinancing of Khan's home. [DE 106, pp. 4–6]. Khan confirmed that he borrowed more than 100% of the value of his home, and used the proceeds to pay off credit card debt. [DE 106, pp. 6]. Khan recalled having been frustrated at the time by a six-month delay between applying for and closing the loan. [DE 106, pp. 7–9]. Later, after the closing, Khan concluded the loan "was not a very good deal." [DE 106, p. 9]. Specifically, after speaking with others in the mortgage industry, he came to believe that the 8% interest rate was a little high and that the provision for a prepayment penalty was not favorable. [DE 106, p. 10].

Khan testified that the first and only time he met Plaintiff was when he went to Defendants' office to sign the loan application, most likely around June, 2004. They spoke about Plaintiff's interest in Pakistani clothing and food. [DE 106, pp. 12–13]. During the several months while Khan was

---

**45.** A good faith estimate is a HUD form that reflects estimates of the charges a borrower is likely to incur at the settlement of a loan.

**46.** At the January 19, 2006 evidentiary hearing, on his own initiative Hussain offered the Court a copy of the good faith estimate and a paper with his handwritten calculations, which the Court received as Defendant's Exhibit 1. [DE 66, pp. 116, 117]. Hussain explained that the handwritten calculations (which he prepared at the hearing) demonstrate that at an interest rate of 6.75%, Hus-

sain would earn a $3,470 commission on the refinancing. Hussain said he prepared the handwritten calculations and provided them and the good faith estimate to the Court because: "I know people are accusing me of I'm giving him zero financing and low rate and I'm making no money." [DE 66, p. 117]. Hussain appeared eager to offer these calculations to the Court, which this Court found to be part of Hussain's calculated efforts to deceive this Court about Khan's motivation in signing the affidavit.

waiting for his loan to close, he called All American Mortgage many times to inquire about the status of his loan. Plaintiff usually answered the telephone; Khan believed Plaintiff was Hussain's secretary. [DE 106, pp. 14–16, 22–23].

Khan acknowledged meeting Hussain for lunch in the first week of December, 2005, at the India House Restaurant but, in contrast to Hussain's testimony, said the meeting was the result of their coincidentally running into each another at the restaurant. [DE 106, pp. 18–19].[47] While at lunch, Hussain brought up the subject of this lawsuit. Hussain said that Plaintiff did not work for him anymore, and that Plaintiff's husband had called and left telephone messages threatening Hussain and calling him names. Hussain had a tape recorder with him and played a recording of those messages for Khan. [DE 106, pp. 21]. The Court made the following inquiry of Khan:

THE COURT: You said that Mr. Hussain said that Ms. Bernal did not work for him anymore?

THE WITNESS: Yes.

THE COURT: Did he acknowledge to you that Ms. Bernal had at one time been his employee?

THE WITNESS: I think by saying that she doesn't work for him anymore constitute that she was working for him one time. I assume.

THE COURT: That was your understanding?

THE WITNESS: That was my understanding. I don't know if she was working as a—voluntarily, because she's the wife of an old friend of his or old associate of his or old colleague—they used to be friends, I believe. I heard that.

So I don't know if there was any remuneration involved or payment was involved in it, because that was not my business, so I didn't go into the detail.

THE COURT: So you are not knowledgeable about whatever arrangement there was, financial arrangement, if any between Ms. Bernal and Mr. Hussain?

THE WITNESS: God's truth, I was not aware of it.

[DE 106, pp. 21–22].

When asked the following question, Khan declined to answer and asserted his Fifth Amendment privilege against self incrimination: "At the India House Restaurant, did you tell Mr. Hussain that Ms. Bernal had spoken with you and offered you some money if you would testify that she had worked at Mr. Hussain's employment?" [DE 106, pp. 22–23]

Khan testified that at lunch Hussain said he felt badly about the first refinancing, and offered to procure a new, more favorable refinancing. Khan was reluctant to do further business with Hussain, and hesitated to refinance before the 2007 expiration of the pre-payment penalty clause on his existing mortgage. For these reasons, Khan was noncommittal about engaging in such a transaction. [DE 106, pp. 23–26].

Khan relied on his Fifth Amendment privilege in not answering the following questions:

(1) Did you meet with Mr. Hussain on December 8, 2005? [DE 106, pp. 26, 31–32].

(2) Between your lunch at the India House and January 19, 2006 had you been with Mr. Hussain on any other occasion? [DE 106, p. 27].

47. Khan denied having spoken with Hussain by telephone after the August wedding and before the December lunch. [DE 106, pp. 19–20].

(3) Did you sign the December 8, 2005 affidavit bearing your name? [DE 106, pp. 17–18].

When shown the good faith estimate, Khan acknowledged his signature at the bottom of the document and said he wrote the date next to his name. Hussain gave Khan the document at Hussain's office and discussed refinancing Khan's home. [DE 106, pp. 28–30]. Khan testified that Hussain offered the 6.5% interest rate on the good faith estimate at that meeting; he denied Hussain had previously offered a different interest rate. [DE 106, p. 30].

Khan also recalled Hussain offering reduced closing costs, but he could not recall the specifics. [DE 106, pp. 47, 49]. Hussain made this offer some time after their lunch at the India House Restaurant. [DE 106, p. 49–50]. Khan speculated that Hussain was motivated to do so because he felt guilty about the terms of the first refinancing. [DE 106, p. 50]. By the time of his testimony, Khan said he had no interest in pursuing the loan proposed by Hussain. [DE 106, p. 46].

Khan relied upon his Fifth Amendment privilege in not answering the following questions:

1) On the good faith estimate when you wrote December 16, 2005, as the date next to your signature, did you write that knowing it was an inaccurate date, that it was not the date you were signing the document? [DE 106, p. 33].

2) Did Ms. Bernal offer you any sort of favor or promise or money in exchange for your providing testimony in this case? [DE 106, p. 33].

3) Did Mr. Hussain make any offer to you of any favor or any money or of any other kind of promise to you in exchange for your signing the affidavit that you have before you dated December 8, 2005? [DE 106, p. 33].

4) Was the statement in the last two sentences of the affidavit (the bribery accusation) false? [DE 106, pp. 35–36].

5) Did Mr. Hussain ever have any conversation with you about his lawyer, Mr. Kleppin? [DE 106, p. 39].

6) Before this affidavit was executed, were you presented with a different affidavit to sign? [DE 106, p. 45].

7) Did you ever express to Mr. Hussain that you did not want to be deposed in this case? [DE 106, p. 45].

### G. Further discovery violations

On January 12, 2006, the Court held a second discovery conference[48] at which it addressed the discovery issues raised in the initial motion for sanctions [DE 48], Defendants' response [DE 50] and Plaintiff's reply [DE 51]. In the course of that hearing the Court compelled further discovery from Defendants, issued a protective order in favor of Plaintiff, and quashed third-party subpoenas improperly issued by Defendants. A written order followed, memorializing the Court's *ore tenus* rulings. [DE 63]. Issues raised at that hearing pertinent to this Report and Recommendation, and the Court's findings are as follows.

### 1. Annual gross revenue

The Court first addressed Defendants' responses to interrogatories and requests for admission stating they all earned less than $500,000 gross revenues for the years in question. [DE 83, pp. 5–20]. Once Defendants were compelled to produce their tax returns, it was learned that Defendant LTDS had, in fact, earned more than that amount. When Hussain was questioned at the discovery conference

---

**48.** The transcript of that hearing is filed with the Court. [DE 83]

about his prior false discovery responses, he described them as an honest mistake and explained that he had not looked at any of his companies' tax returns or financial records before answering those inquiries, nor did he give any consideration to doing so. [DE 83, p. 10]. Kleppin also said that he did not look at those tax returns, but rather relied on his client when he argued to the Court that the Defendants' annual gross revenues were low enough that they were not subject to the FLSA. [DE 83, pp. 18–20].

Thus, it became clear, at minimum, that Hussain recklessly gave false discovery responses having made no effort to first confirm the accuracy of his information. Taken in the context of Hussain's numerous instances of established dishonesty however, this Court believes it likely that Hussain falsely denied those discovery inquiries in a deliberate effort to defeat Plaintiff's lawsuit. Kleppin's failure to review any of his clients' financial records before issuing these discovery responses, and repeated argument to the Court that Defendants' gross annual income fell below the jurisdictional amount, fell short of his obligations under Rule 26(g) and Rule 11(b).

### 2. HUD–1 statements in Plaintiff's name

The Court also addressed Defendants' late disclosure of the two HUD–1 statements in Plaintiff's name, despite prior sworn discovery responses stating Defendants had no documents with Plaintiff's name. [DE 83, pp. 33–51]. Hussain again characterized this as an innocent oversight, although he acknowledged he did not review all his documents before responding to discovery. [DE 83, pp. 38–41, 44–45]. He again offered that he believed the only documents he had to produce

were those that established Plaintiff's employment, which the HUD–1 statements did not do. [DE 83, pp. 42–43, 46]. The discovery requests made no such qualification, and when the Court asked Hussain if he read those requests before answering them, he responded:

> I did a couple of times, but it's not very clear some time. If a question is not clear to me, I denied that. Some time I went to Mr. Kleppin and some portions were not clear to me, I just denied the question.

[DE 83, p. 43].

From the record it is clear that Hussain made no genuine effort to honestly respond to these inquiries. Both Kleppin and Hussain told the Court that they met many times after the December 6th discovery conference, and Hussain said he read Plaintiff's discovery requests with Kleppin before preparing his response. [DE 83, p. 46]. While it appears that the HUD–1 statements ultimately produced concerned a transaction Plaintiff undertook for her own benefit, and were not evidence of her employment, that in no way justified Hussain's failure to identify those documents. Moreover, it was deceptive for Kleppin to narrow the scope of his client's discovery responses (to those documents that would prove Plaintiff worked for Defendants) without informing his opposing counsel.

### 3. LaBelle Petroleum's employees

Another issue addressed at the January 12, 2006 discovery conference was Defendant LaBelle Petroleum's failure to comply with an order issued at the December 6th discovery conference compelling Defendants to identify all of their employees and independent contractors over a several-year period. [DE 46, ¶ 4].[49] On December 12, 2005 LaBelle responded with a list of

---

**49.** *See* generally DE 83, pp. 59–74.

five names. [DE 83, p. 60]. In her reply memorandum, Plaintiff referred to a payroll spreadsheet [50] that included five other LaBelle employees not disclosed by Defendants. [DE 51, pp. 5–6]. LaBelle thereafter amended its interrogatory response to add these and a few more names. [DE 83, pp. 60–63]. In his reply memorandum and at the discovery conference, Plaintiff's counsel questioned how Hussain could have innocently overlooked half of his small workforce. Hussain responded that he was overwhelmed by responsibilities and this was yet another innocent mistake. [DE 83, p. 64]. This Court finds that at best this inaccurate discovery response was due to Hussain's deliberate indifference to his obligation to truthfully respond to Plaintiff's inquiries and to his lawyer's failure to adequately supervise his client in this regard.

### 4. Hussain's false denials of requests for admission

At the January 12th discovery conference, Plaintiff brought to the Court's attention an entirely new category of discovery misconduct by Defendants.

Months earlier, Plaintiff propounded numerous requests for admissions [51] designed to test Defendants' assertion, as part of their argument that they were not governed by the FLSA, that their businesses did not affect interstate commerce. Thus, for example, Plaintiffs inquired if Defendants ever placed or accepted a telephone call from outside the State of Florida, if they ever sent mail outside the State, or received mail that originated outside Florida. [DE 83, p. 21]. Defendants were also

asked "have you ever deposited money in a nationally chartered bank?" [DE 83, p. 29]. In their October 12, 2005 responses, signed by Kleppin, Defendants All American Mortgage Bank, LaBelle Petroleum and LTDS Petroleum all denied these requests. [DE 83, pp. 21–25; DE 73, p. 16, Ex. 24, pp. 78–9].

Plaintiff deposed Hussain on January 5, 2005 and questioned him about his and his companies' denials of these and other requests for admissions. When asked why he denied one of these requests, Hussain responded:

A. Sir, this lawsuit bring to the bogus lawsuit on me. So why should I answer something that does not concern me?

\* \* \*

A. Sir, I don't feel I like to answer this question. They are bogus lawsuit they file against me and my corporation.

\* \* \*

A. That's why I did not answer. I feel these are—This thing ambush on me for no reason. I don't know these people. They are nothing concerned over this, Labelle Petroleum, Inc. Why should Labelle Petroleum, Inc., answer these questions? That's why I deny this.

\* \* \*

Q. No, I am just asking you, why do you feel that—As Labelle, why should you not have to answer these requests for admissions?

---

50. Plaintiff asserts that one of her clerical duties for Defendants was to prepare this spreadsheet. [DE 51, p. 5, n. 7]. Plaintiff produced this spreadsheet to Defendants as part of her Rule 26 disclosures. [DE 83, p. 72].

51. The requests for admissions and responses were not filed with the Court, although they were handed up to the Court during the January 12, 2006 discovery conference. They were summarized in Plaintiff's supplemental memorandum of law. [DE 73, pp. 12–16].

A. Because I thought this lawsuit— The lawsuit are bogus. Why should I answer this? Waste my time.

\* \* \*

A. I feel like it, I don't have to answer this thing. That's why I denied it.

Q. That's why you denied it; because you felt that you didn't have to answer it?

A. I just told you, sir. Why you repeating same question again and again?

[DE 73, Ex. 24, pp. 65–67]. After his deposition Hussain served supplemental responses, substituting admissions for a number of the prior denials. [DE 83, p. 26]

At the January 12th discovery conference, Kleppin attempted to justify Defendants' false answers, arguing that the phrase "at your office" was ambiguous.[52] [DE 83, p. 25]. When asked by the Court to explain why he did not provide a qualified answer to the request for admissions as required by Rule 36 instead of the misleading outright denial, Mr. Kleppin advised the Court that he "did not know that [he] had to be that specific. . . ." [DE 83, pp. 27–28]. It was apparent to the Court that Kleppin had not read the rule.

Both Hussain and Kleppin acted in extreme bad faith in summarily denying these inquiries. Hussain was clear that he deliberately provided false answers to Plaintiff's inquiries because he believed the lawsuit was "bogus" and a waste of time. As for Kleppin, he abdicated his duty to make reasonable efforts to insure that his client was providing truthful discovery responses.

## 5. Plaintiff's letter on behalf of All American Mortgage

At the conclusion of the January 12th discovery conference, the Court warned Hussain of the possible consequences of his actions:

THE COURT: Let me say this because it is my obligation, Mr. Hussain, it is important that you understand this, sir. If you or your companies fail to comply with any order I have issued today or any [order] that I have issued in the past, this could result in sanctions, including but not necessarily coming to this, but it could include striking your answers and your affirmative defenses, leading to a default judgment against you and the other defendants. I want to make sure out of fairness to you that you understand the consequences of failing to comply with the Court's orders regarding discovery. Do you understand that, sir?

THE DEFENDANT: Yes, ma'am.

THE COURT: If you have any questions for me, I would be very happy to answer any of that for you. Do you have any questions?

THE DEFENDANT: No, ma'am.

[DE 83, pp. 89–90]. Despite this warning, in a matter of days there was further proof that Hussain had not met his discovery obligations.

At the January 12th conference, the Court compelled Defendants to make available for inspection all documents related to their real estate clients from 2003 through mid–2005. [DE 83, p. 58; DE 63, ¶ 3]. Plaintiff's counsel inspected those files on Monday, January 16th and found the

---

**52.** One question, for example, asked: "Admit you have sent items by U.S. or express mail from your office outside the state of Florida." [DE 73, p. 16]. In fact, the term "office" was defined in the instructions to the requests for admissions as "your place of business at 1876 N. University Drive, Sunrise, Florida." [DE 73, p. 15, n. 16].

following letter, written on All American Mortgage Bank letterhead:

SUBJECT: 15369 BELLMAR CIRCLE UNIT # 223, FORT MEYERS, FL

Dear Property Manager,

Please fill out the condo questionnaire and mail us back at our above address. Borrower is mailing a check for $100.00.

Thank you,

Diana Bernal

Loan Processor

[DE 73, p. 10, Ex. 14; DE 66, pp. 152–53].

Defendants had repeatedly denied the existence of this and any other documents bearing Plaintiff's name. This letter was directly responsive to multiple discovery requests and should have been produced months earlier. It went to the heart of the dispute whether Plaintiff had worked for Defendants. When Plaintiff's counsel uncovered the letter only four days remained in the discovery period and Defendants had been deposed. [DE 66, p. 154].

Hussain was asked about this at the January 19, 2006 evidentiary hearing; he again swore Plaintiff had never worked for him. [DE 66, p. 158]. Hussain explained that he wrote the letter without Plaintiff's knowledge and permission, and falsely identified Plaintiff as an employee of All American Mortgage. Hussain felt justified in falsely using Plaintiff's name because the person to whom the letter was addressed had given Hussain a hard time and had not provided Hussain the documents he needed. Hussain hoped that if the letter was written with someone else's name instead of his own, this would lead to a better response. [DE 66, pp. 154–58].

The letter was written in February or March, 2005, and related to a particular client of All American Mortgage, whose file, including the letter, had been in Hussain's possession since that time. [DE 66,

p. 160]. As for his failure to produce the letter in discovery, Hussain explained to the Court:

Ma'am, I never think about this letter. I told you before I am sure Diana Bernal did not work for me. I never recalled it. I didn't review the file.

[DE 66, p. 158].

On this record, Hussain's explanation that he chose to identify Plaintiff, the very same person he insists never worked for him, as his employee as a matter of convenience defies belief. If he merely needed any name to substitute for his own, why choose Plaintiff's? It is far more likely that Hussain's deception was not using Plaintiff's name on this letter without her permission, but rather hiding the letter during the discovery process and falsely insisting that Plaintiff never worked for any Defendant.

On this record it has become impossible to rely upon Hussain's word. Hussain has admitted to multiple deceptions, both in the events that led to this lawsuit and in the litigation itself. In numerous statements he has demonstrated his complete disregard for the judicial process. Hussain sought to purchase Khan's testimony and later lied under oath to cover up his misconduct. These circumstances have compounded such that Mr. Hussain lacks any credibility with this Court.

## II. Analysis

Defendants and their attorney Chris Kleppin have engaged in various forms of misconduct that merits the imposition of serious sanctions.

### A. Rule 11

#### 1. Counsel's obligation

After this Court received the testimony of Hussain, Kleppin and Khan, it issued an

Order to Show Cause directing Kleppin, his partner Harry Boreth and their law firm to show cause why they should not be sanctioned under Rule 11, Fed.R.Civ.P., in connection with their filing of the response memorandum. [DE 85].[53]

■■■ Rule 11 imposes an affirmative duty on attorneys to conduct a reasonable inquiry into the validity of a pleading before it is signed. *Donaldson v. Clark,* 819 F.2d 1551, 1555 (11th Cir.1987) (quoting Advisory Committee Notes to 1983 amendments). The district court has the discretion to impose Rule 11 sanctions:

> (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith or for an improper purpose.

*Anderson v. Smithfield Foods, Inc.,* 353 F.3d 912, 915 (11th Cir.2003) (citations omitted). The standard is an objective one: reasonableness under the circumstances. *Kaplan v. DaimlerChrysler, A.G.,* 331 F.3d 1251, 1255 (11th Cir.2003). The Court must determine "whether a reasonable attorney in like circumstances could believe his actions were factually and legally justified." *Id.* (citations omitted); *see also Anderson,* 353 F.3d at 912. Courts should "avoid using the wisdom of hindsight" and "test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *Donaldson,* 819

F.2d at 1556 (quoting Advisory Committee Notes to 1983 amendments).

The court may impose sanctions under Rule 11 either on a party's motion, or on the court's own initiative. Fed.R.Civ.P. 11(c)(1). When a party seeks Rule 11 sanctions it must satisfy the "safe harbor" provisions of Rule 11(c)(1)(A). Specifically, the party must describe in its motion "the specific conduct alleged to violate subdivision (b)" of the rule and serve the motion on opposing counsel, but not file it with the court, unless within 21 days after service "the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Fed.R.Civ.P. 11(c)(1)(A).

Alternatively, as was the case here, the Court may issue an order to show cause that describes "the specific conduct that appears to violate" the rule. Fed.R.Civ.P. 11(c)(1)(B). Because no safe harbor opportunity exists to withdraw or correct a submission challenged in court-initiated proceedings, the rule's drafters commented, and this Circuit has recognized, that the initiating court must employ "a higher standard (akin to contempt) than [that employed] in the case of party-initiated sanctions." *Kaplan,* 331 F.3d at 1255.

### 2. Sanctionable conduct

The Court, in its Order to Show Cause, directed defense counsel to account for the filing of the Khan affidavit, with its allegation that Plaintiff called Khan on two occasions and both times offered Khan $6,000 if he would falsely testify that Plaintiff had been an employee of Hussain. Defense

---

**53.** By that time Kleppin and his law firm had retained counsel of their own, [DE 76], and arrangements were underway for new counsel to be substituted on behalf of Defendants. [DE 106, pp. 57–59]. These arrangements were finalized on March 8, 2006. [DE 89,

92]. Kleppin and his firm's response to the Order to Show Cause is docketed at DE 94. After careful of review of the entire record, this Court does not recommend that sanctions be imposed upon Mr. Boreth or the law firm.

counsel were asked to explain their reliance on this allegation when they argued, in the response memorandum, that Plaintiff's initial motion for sanctions had been filed "in bad faith," that Plaintiff and her counsel should be "severely sanctioned" and that Plaintiff had filed her motion as a "preemptive strike to the filing of a Rule 11 Motion by the Defendants." [DE 85]. Defense counsel, in their responsive memorandum, offered nothing to dispel the inescapable conclusion that their (1) filing this affidavit with the Court, (2) promoting it as a basis to sanction Plaintiff and her counsel, and (3) empty threat of a motion for Rule 11 sanctions against Plaintiff or her counsel, was entirely unreasonable and violated Rule 11.[54]

■ The record is abundantly clear that Kleppin made *no* inquiry to determine if Khan's bribery accusation was truthful. Khan was the *only* person (other than Plaintiff herself) with any knowledge of the truth of his claim. The only way to investigate his allegation was to speak with Khan, but Kleppin made no effort to do so.

Instead Kleppin simply, and solely, relied on the word of his client. He believed his client, and believed his client's insistence that Plaintiff was a dishonest person, and on this basis alone felt justified in filing the affidavit with the Court. And he did this knowing next to nothing about Khan. This, indisputably, does not amount to a reasonable investigation. "Blind reliance on the client is seldom a sufficient inquiry...." *Southern Leasing Partners, Ltd. v. McMullan,* 801 F.2d 783, 788 (5th Cir.1986). As the Fourth Circuit has said:

"We emphatically reject any suggestion that a lawyer may shield his transgressions behind the simplistic plea that he only did what his client desired." *Blair v. Shenandoah Women's Center, Inc.,* 757 F.2d 1435, 1438 (4th Cir.1985).

Kleppin's blind reliance on his client was especially unreasonable given the nature of Khan's charges. The affidavit accused Plaintiff of bribery, witness tampering, obstruction of justice and subornation of perjury: serious criminal conduct under any circumstance, but extraordinary charges in the context of otherwise ordinary civil litigation. If true, not only would this cause the dismissal of Plaintiff's lawsuit, it would likely land her in jail. Charges such as these can ruin one's reputation, livelihood and immigration status. An officer of the court is expected to know that such accusations must not be casually made. *See Byrne v. Nezhat,* 261 F.3d 1075, 1105 (11th Cir.2001) ("Byrne's responsibility to [conduct] a thorough, reasonable, and objective investigation of the claims at issue was heightened ... because of the extraordinary nature of the RICO allegations in this case.")

In evaluating the reasonableness of Kleppin's actions, this Court must look at the circumstances he faced at the time. Kleppin knew his client's "level of anxiety" about the case was "great"—as much as or more so than any client Kleppin had represented. He also knew there was "serious bad blood" between Hussain and Plaintiff and her husband. Kleppin saw that his client was "in a hurry to get this before

---

**54.** Rule 11 does not apply to "discovery requests, responses, objections and motions that are subject to the provisions of Rule 26 through 37." Fed.R.Civ.P. 11(d). Kleppin argues that his response memorandum falls within this exception to Rule 11, as it addressed Plaintiff's motion, which sought sanctions for discovery violations. [*See e.g.,* DE 94, p. 17]. Kleppin is plainly wrong. His statements in the response that are the focus of this Court's Order to Show Cause are not governed by the certification standards of Rules 26(g) and 37 and are not sanctionable under those rules. *See generally,* Advisory Committee Notes to 1993 Amendments.

the Court." When Kleppin told his client that he'd like to take Khan's deposition, his client was flatly opposed, without offering a good, much less compelling, reason. A reasonable attorney in Kleppin's shoes, faced with these circumstances, would be expected to recognize the need for caution. Instead Kleppin used the affidavit to launch a blistering attack on Plaintiff and her attorney. He filed it with the Court and argued it was reason to deny the motion and to "severely sanction" both Plaintiff and her attorney. In his December 16, 2005 "Rule 11 letter" Kleppin quoted the affidavit, without the simple decency of giving a copy of it to his opposing counsel, and accused Cassata of being "complicit in Ms. Bernal's fabrications." Kleppin further relied on it in his response memorandum when he said he was preparing to file a Rule 11 sanctions motion against Plaintiff or her lawyer.

Kleppin did all of this having been presented a reasonable alternative by Plaintiff's counsel: have both counsel inform the court of the affidavit and seek a suspension of pre-trial deadlines while the charges were investigated. In his December 19th correspondence Kleppin rejected this proposal, saying he would "inform the Court in an appropriate manner of the affidavit."

Kleppin believed these scandalous charges could be filed with the Court and later sorted out in discovery. Kleppin clearly wanted to take Khan's deposition, and noticed that deposition for January, 2006, although he did so without knowing if Khan would cooperate. This approach of "throwing it against the wall and seeing what sticks" is precisely the sort of conduct Rule 11 seeks to counter. *See Southern Leasing Partners, Ltd.,* 801 F.2d at 788 ([Plaintiffs] sued [defendant] without knowing how he fit into the picture, apparently hoping that later discovery would

uncover something. If Rule 11 is to mean anything and we think it does, it must mean an end to such expeditionary pleadings . . . .).

It also appears that Kleppin, with no concern for the truth of the affidavit, used it to try to force the dismissal of the lawsuit. He knew his client was very anxious to end this litigation, and he began to draft a motion to dismiss. Kleppin explained his thinking as follows:

> Frankly as a lawyer I wanted this to lead to a quicker resolution . . . of this case. Whether the quicker resolution is Mr. Hussain loses or wins, hey, this is for the Court—
>
> * * *
>
> Well, it is fair to say that I at that time thought that they would dismiss this possibly or at least ask their client, hey what's going on here? That kind of thing. At least I thought it would lead to a dialog, some discussion, some communication between the lawyers to somehow let's reign this in. What's really happening here.

[DE 66, p. 52]. A "quicker solution" could only be a dismissal or a highly favorable settlement. Kleppin's feigned indifference to the ultimate victor of the lawsuit, and his claim of a benign hope that this "would lead to a dialog" between the lawyers, are not worthy of belief. If Kleppin sought a dialogue, he had that opportunity when he told Cassata about the affidavit: Cassata offered up his own client for FBI scrutiny. Filing the affidavit with the Court and accusing his opposing counsel of "bad faith" was hardly conducive to opening up a "dialog." His actions were designed to strong-arm a settlement or dismissal of this lawsuit.

In this and many other instances, this Court found Kleppin lacking credibility. His frequent inability to recall events ap-

peared convenient. His absence of records to document events suggested at best a serious lack of organization and at worst an opportunity to cloud or distort those events. His frequent excuses and repeated failure to directly answer the Court's questions, and habit of diverting to more favorable topics (often, the Plaintiff's alleged misdeeds) strongly suggested a lack of candor.

In his brief, Kleppin argued that he reasonably relied on Khan's affidavit because it was made under oath, which was some guarantee of the veracity of Khan's statements. Had Kleppin met with Khan and questioned Khan about, among other things, the particular circumstances surrounding Plaintiff's supposed bribe, Khan's contacting Hussain to convey this information and his relationship with Hussain, and had Kleppin witnessed Khan being sworn by the notary or otherwise verified that this took place, the fact of the notarization would be worthy of his consideration. But, that did not happen here. Instead Kleppin drafted an affidavit on the word of his client for someone he'd never met, and let his client take the draft affidavit and return it with minor changes, signed and apparently notarized.[55] This was not an "inquiry reasonable under the circumstances." Fed.R.Civ.P. 11.

Nor can Kleppin convincingly argue that the disclaimer in the final paragraph of the response excuses his conduct:

> While discovery is certainly not over, and Mr. Khan is set for deposition in early January, 2006, and will certainly be vigorously examined by Plaintiff's counsel, and while Plaintiff has denied the allegations contained in Mr. Khan's Affidavit, and while neither undersigned counsel nor Mr. Cassata can say for sure who is lying and who is telling the truth because neither one of them were in the Sunrise, Florida business office at the relevant times, it appears from the evidence adduced thus far that it is not Mr. Hussain who is the dishonest party.

[DE 50, p. 18]. These words are at odds with the remainder of the paragraph and, in fact, the remainder of the memorandum. Kleppin did not ask the Court to hold off sanctioning Plaintiff and her attorney, nor did he specifically advise the court, as permitted by Rule 11, that Khan's accusations were "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). Instead he asked this Court to take action.

This Court finds that Kleppin made a knowing, false statement to the Court when he wrote in his response memorandum that Plaintiff's motion was a "preemptive strike to the filing of a Rule 11 Motion by the Defendants, because the Defendants recently came into possession of two important pieces of evidence," the transcript of the telephone messages and the Khan affidavit. Kleppin knew better. He first told Cassata about the Khan affidavit on December 15, 2005, while Cassata was drafting his motion. It is undisputed that in the same telephone conversation Cassata told Kleppin what he was doing, and identified the discovery issues that were the subject of the motion. Cassata served the motion on Kleppin within hours of that conversation, and the motion is obviously one that could not have been prepared in less time. As for the recorded telephone messages, these recordings were made months earlier, before the lawsuit was

---

55. Hussain, who accompanied Khan to the notary, testified that the notary did not administer an oath to Khan before signing the notarial certificate. [DE 66, p. 113]. It appears an oath should have been administered by the notary under these circumstances. *See* Fla. Stat. § 92.525.

filed, and Cassata was informed about them on November 9th.[56] Finally, on December 15, 2005 Cassata had no reason to believe Defendants were preparing a Rule 11 motion for sanctions against him or his client. Kleppin first made this threat in the letter he wrote the following day—after Cassata filed and served his motion. Even then Kleppin did not serve Cassata with a draft motion, nor did he specifically identify for Cassata the representations claimed to be sanctionable.

For these reasons it is clear to this Court that Kleppin's characterization of the sanctions motion as a "preemptive strike" was made with complete disregard for the information known to him, in a combative effort to minimize his clients' failures to meet their discovery obligations, and to divert this Court's attention to phantom misconduct by Plaintiff and her attorney. It is thus clear that Kleppin made these representations for an improper purpose, as prohibited by Rule 11. *See Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1294 (11th Cir.2002) ("Sanctions are warranted [under Rule 11] when a party exhibits a deliberate indifference to obvious facts . . . .") (citation and internal quotation marks omitted).

Kleppin's contention that his misconduct is somehow mitigated by Plaintiff's having sought the ultimate sanction of default judgment on a record of discovery violations that did not warrant such an extreme remedy, is another attempt to divert the Court from the issues at hand. All attorneys, when they sign motions and pleadings, are accountable for meeting their obligations under Rule 11. That their opposing counsel take unpersuasive, or even unreasonable, positions does not diminish their obligations under Rule 11.

This Court therefore concludes that no reasonable attorney in these circumstances could believe these actions were factually and legally justified. For the reasons already stated, Kleppin did not make a reasonable inquiry under the circumstances to determine whether the bribery accusation in Khan's affidavit had evidentiary support. The record is also clear that Kleppin acted with an improper purpose—to harass and intimidate Plaintiff and her counsel—when he filed that affidavit with this Court and relied on it to argue that Plaintiff had acted in bad faith, that her counsel had filed the sanctions motion as a "preemptive strike" and that they therefore should be "severely sanctioned." Finally, Kleppin also knew there was "no evidentiary support" for his stated intention to file a Rule 11 motion against Plaintiff or her lawyer. If Kleppin had read Rule 11, he would have known that claim was not "warranted by existing law."

### 3. Appropriate sanctions

The Rule provides that "[a] sanction imposed for violations of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R.Civ.P. 11(c)(2). Sanctions under Rule 11 have been recognized to serve the multiple purposes of punishment, compensation and deterrence. *Donaldson*, 819 F.2d at 1556; *Brandt v. Schal Assocs., Inc.*, 960 F.2d 640, 645–46 (7th Cir.1992). As a general proposition, the Rule gives the Court discretion to fashion an appropriate sanction. *Donaldson*, 819 F.2d at 1556–57. That discretion is somewhat circumscribed in the case of a Court's *sua sponte* motion:

> Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a

---

**56.** While these messages were offensive and inflammatory, Kleppin has yet to articulate how they could lead to Rule 11 sanctions against Plaintiff.

nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

Fed.R.Civ.P. 11(c)(2).

Kleppin's conduct in filing the response memorandum fell well below that expected of a reasonable attorney. Sadly, other divisions of this Court have previously admonished or imposed sanctions against Kleppin, with no apparent deterrent effect.[57] On this record, this Court has no choice but to impose serious sanctions in a continued effort to deter further misconduct.

In settling on an appropriate sanction, the Court is mindful that Rule 11 is not the only authority to sanction Kleppin for the conduct addressed by the Order to Show Cause: this Court's inherent power and the authority of 28 U.S.C. § 1927 also call for the imposition of sanctions. See Section II(B) and (D). Both clearly empower this Court to order Kleppin to compensate Plaintiff for all attorneys' fees and costs reasonably incurred as a result of the filing of his response memorandum, and this Court recommends that those expenses be imposed pursuant to those two provisions. See Section IV. So long as that recommendation is adopted, this Court sees no need for further sanctions under Rule 11, such as payment of a fine to the Court.[58]

## B. Title 28 U.S.C. § 1927

 Kleppin's conduct in filing the response memorandum, and his issuance of certain discovery, also violated the proscriptions of 28 U.S.C. § 1927. That statute, which applies only to attorneys, provides:

> Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

There are three essential requirements for imposing sanctions under § 1927. First, the attorney must engage in unreasonable

---

**57.** *See Dunford v. Rolly Marine Serv. Co.,* 233 F.R.D. 635, 638 (S.D.Fla. Dec.1, 2005) (Torres, J.) (reminding Kleppin that "as officers of the court, attorneys must implement their zealous advocacy using a perspective that looks beyond the next motion"); *Rodriguez v. Carey Int'l, Inc.,* 03–22442–CIV–UNGARO–BENAGES, [DE 103, Sept. 29, 2004], and *Bosniak v. Carey Int'l, Inc.,* 03–23211–CIV–UNGARO–BENAGES, [DE 224, Sept 29, 2004], (Klein, J.) (imposing § 1927 sanctions against Kleppin in the two related cases and finding that Kleppin "engaged in numerous instances of discovery abuse, gave evasive and incomplete answers to discovery requests, acted in bad faith, failed to comply with previous court orders and otherwise engaged in conduct which multiplied the proceedings unreasonably and vexatiously ....")(order subsequently vacated as condition of settlement agreement). *See also Bernstein v. Boies, Schiller & Flexner, L.L.P.,* 416 F.Supp.2d 1329, 1333–34 (S.D.Fla. Feb.2, 2006) (Moore, J.) (finding that Kleppin's conduct in Case No. 05–61126–CIV–MOORE/GARBER amounted to "an abuse of the judicial process by conduct tantamount to bad faith" and imposing § 1927 sanctions); *Bernstein v. Boies, Schiller & Flexner, L.L.P.,* 2006 WL 2175468, *1 (S.D.Fla. July 5, 2006) (Court refused to vacate order pursuant to later settlement agreement).

**58.** Moreover, this Court has not identified a directive of a nonmonetary nature that would accomplish the goals of Rule 11 sanctions in this case. In the event the Court does not elect to impose upon Kleppin all reasonable attorneys' fees incurred by Plaintiff as a result of his response memorandum, this Court might alternatively order Kleppin to pay a penalty into the registry of the Court.

and vexatious conduct; second, that conduct must multiply the proceedings; and third, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, that is, the sanction may not exceed the costs, expenses and attorneys' fees reasonably incurred because of the conduct. *Peterson v. BMI Refractories,* 124 F.3d 1386, 1396 (11th Cir.1997). The provisions of § 1927 are penal in nature, and therefore must be strictly construed. *Peterson,* 124 F.3d at 1395.

■■ Unlike Rule 11, which is aimed primarily at written filings, § 1927 obligates attorneys to avoid dilatory tactics throughout the entire litigation. *Allapattah Servs., Inc. v. Exxon Corp.,* 372 F.Supp.2d 1344, 1372–73 (S.D.Fla.2005). Section 1927 does not reach all objectionable conduct by attorneys. In addition to the three prerequisites listed above, it has consistently been held that the unreasonable and vexatious conduct must be so egregious that it amounts to bad faith. *Amlong v. Denny's, Inc.,* 457 F.3d 1180, 1190 (11th Cir.2006). In the context of § 1927, bad faith is measured by the attorney's objective conduct; it does not require a finding of malicious intent or bad purpose, although the attorney's subjective state of mind can be considered by the Court. *Id.* at 1190–91. Reckless conduct is sufficient to justify sanctions under § 1927. *Id.* at 1191. Reckless conduct "simply means conduct that grossly deviates from reasonable conduct." *Id.* (citations omitted).

> Thus, an attorney's conduct must be particularly egregious to warrant the imposition of sanctions—the attorney must *knowingly* or *recklessly* pursue a frivolous claim or needlessly obstruct the litigation of a non-frivolous claim. If the attorney's misconduct meets this high standard, the district court may order the attorney to pay the "costs, expenses, and attorneys' fees reasonably incurred" because of the attorney's misconduct—that is, the excess costs that the attorney's multiplication of proceedings has added to the costs of the litigation.

*Id.* (citations omitted).[59]

■ For the reasons stated in the preceding section, this Court finds that Kleppin acted in bad faith when he filed the Khan affidavit with the Court and relied on it in his response memorandum. Kleppin was reckless, that is he "grossly deviate[d] from reasonable conduct," when he relied solely on the word of his client before filing the affidavit. He also acted in bad faith when he knowingly and falsely characterized the motion for sanctions as a "preemptive strike" to his upcoming Rule 11 motion. He did so to divert this Court from addressing his clients' failure to meet their discovery obligations.

By any objective measure, Kleppin "unreasonably and vexatiously" multiplied these proceedings and it is recommended that he be ordered to personally satisfy the excess costs, including attorneys fees, Plaintiff incurred as a result of his actions. The filing of the response memorandum triggered a series of evidentiary hearings, caused this Court to issue its Order to Show Cause, brought about substitution of defense counsel and caused the parties to file a multitude of pleadings that otherwise never would have been necessary. Without it, this comprehensive Report and Recommendation and the consequent process of objections and review by the District

---

**59.** By comparison, negligent conduct, standing alone, will not support a finding of bad faith under § 1927: "an attorney's conduct will not warrant sanctions if it simply fails to meet the standard of conduct expected from a reasonable attorney." *Amlong,* 457 F.3d at 1193.

Court Judge, would not have been necessary. If these recommendations are adopted, the response memorandum will also be responsible in large measure for subsequent hearings on attorneys' fees.

Although not nearly as costly to the Court or Plaintiff, Kleppin's conduct in issuing the interrogatory and requests for admission that inquired about Cassata's purported theft of documents from Kleppin's firm is likewise sanctionable under § 1927. As this Court has already found, Kleppin issued this discovery with the subjective intent to harass and intimidate Plaintiff and her counsel, and thereby obstruct the progress of this lawsuit on the merits. Kleppin knew the information he sought went well beyond Plaintiff's knowledge and the matters at issue. This Court specifically finds that Kleppin's conduct in issuing this discovery met the standard of objective bad faith and merits sanctions. This Court believes that the sanctions scheme it otherwise recommends will adequately account for this entirely unprofessional conduct.

## C. Federal Rules of Civil Procedure 26(g) and 37(a)(4)

The federal rules governing discovery serve as an yet another ground to sanction both Kleppin and Hussain.

### 1. Rule 26(g)

Rule 26(g) requires that an attorney of record sign discovery-related filings, and prescribes that the signature certifies that the filing conforms to the discovery rules, is made for a proper purpose, and does not impose undue burdens on the opposing party in light of the circumstances of the case. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372 (11th Cir.1997); Rule 26(g)(2), Fed.R.Civ.P. The rule further requires that if the court finds that "without substantial justification a certification is

made in violation of the rule," it must impose on the offending attorney "an appropriate sanction, which may include an order to pay" the other party's expenses including attorneys' fees. *Chudasama,* 123 F.3d at 1372, (quoting Rule 26(g)(3)).

■ Rule 26(g) thus imposes upon attorneys the duty to make a reasonable investigation to assure that their clients have provided all available responsive information and documents. *Sexton v. U.S.,* No. 6:99 CV 102–ORL–3AB–122, 2001 WL 649445, at *1 (M.D.Fla. April 12, 2001). The signing attorney is not required to certify the truthfulness of the client's response, only that he made a reasonable effort to insure that his clients provided all responsive documents and information. *Tampa Port Auth. v. M/V Duchess,* No. 94–1727–CIV–T–23C, 1997 WL 1175718, at *6 (M.D.Fla. June 6, 1997) (citing 1983 Advisory Committee notes).

■ The record before this Court strongly suggests that as a matter of practice Kleppin did not undertake a reasonable investigation, as required by Rule 26(g), before signing and issuing his clients' discovery requests, responses or objections. The record shows several clear violations of Rule 26(g).

One such example is Kleppin's issuance of the interrogatory and requests for admissions that asked Plaintiff about Cassata's alleged document theft. Here Kleppin failed in every aspect of the Rule 26(g) certification: the requests did not conform to the discovery rules, they were not made for a proper purpose and they imposed undue burdens on Plaintiff. Further, for reasons already stated, this Court finds that Kleppin issued this discovery without substantial justification. In particular, this Court does not credit Kleppin's explanation that these discovery requests legiti-

mately sought information pertinent to a possible future claim for fees by Plaintiff.

Another clear example of Kleppin's disregard of his obligation under Rule 26(g) was his certification of his clients' interrogatory responses stating that each Defendant's gross annual revenue was less than $500,000 for the years in question. As Kleppin and Hussain later acknowledged, neither reviewed any client records before issuing these responses. Kleppin simply relied on Hussain's assurance that this his businesses' annual gross income fell below this amount, and he took no steps to insure that Hussain had confirmed this by reviewing financial records.[60] In short, Kleppin did not make a reasonable investigation to assure that his clients had provided all available responsive information, and he presented no substantial justification for his failure to do so.

The record is also clear that Kleppin did not satisfy his Rule 26(g) obligations when he signed his clients' numerous false responses to requests for admissions and interrogatories denying Defendants had made use of the interstate mails and telephone system and nationally chartered banks. It is highly improbable that any real estate or mortgage broker, or gas station, no matter how small the operation, would never receive or place an out-of-state telephone call, receive or send mail out of state, or make a deposit in a nationally chartered bank. Kleppin should have immediately challenged Hussain's denial of these inquiries, and should have insisted that Hussain provide supporting documentation before Kleppin signed these discovery responses. In failing to do this, Kleppin demonstrated a flagrant disregard of his obligations as counsel of record.

Rule 26(g)(3) provides that where, as here, a certification is made without substantial justification, the court

> *shall* impose upon the person who made the certification, *the party on whose behalf the disclosure, request, response, or objection is made, or both,* an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee. (emphasis added)

Thus, the rule contemplates that sanctions must be imposed not only upon the attorney who fails to conduct a reasonable investigation, but also upon his clients if they are complicit in the violation of the rule. While this Court does not hold Defendants accountable for the discovery requests concerning Cassata's alleged document theft, as they were conceived and executed by Kleppin alone, the record is clear that Defendants bear equal responsibility for the last two examples given here (discovery responses concerning annual gross revenues and interstate commerce). Thus, any sanctions imposed against Kleppin for this conduct should be equally born by Defendants.

As for the type of sanction, the Court may exercise its discretion in making that determination after considering the needs of the case. *Chudasama,* 123 F.3d at 1372. Here, independent of their violations of Rule 26(g), broad sanctions are recommended against Kleppin and Hussain for their misconduct. If the recommendations are adopted and implemented, this Court will hold further hearings to determine Plaintiff's reasonable attorneys' fees and costs, all of which will be compensated. Thus it would be redundant, as well as unduly burdensome, for the parties and the Court to segregate the attorneys'

---

**60.** As already noted, when the Court compelled Defendants to produce their tax re-turns, it was established that LTDS Petroleum's response was false.

fees and costs that resulted from these particular discovery requests and responses and separately apportion them between Defendants and Kleppin. Further, to the extent that Kleppin's mishandling of his clients' discovery obligations implicates his qualification to serve as a member of various bars, that is best addressed by referral from to this Court to the applicable bars. For these reasons, this Court recommends that the Rule 26(g) violations be sanctioned as otherwise recommended.

### 2. Rule 37(a)(4)

Rule 37 authorizes a panoply of sanctions for a party's failure to comply with the rules of discovery. Brief mention is made here of Rule 37(a)(4)(A), which provides that upon granting a motion to compel, the court

> *shall* ... require ... the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds ... that the opposing party's [conduct] was substantially justified, or that other circumstances make an award of expenses unjust. (emphasis added).

After lengthy discovery conferences held on December 6, 2005, and January 12, 2006, this Court granted multiple *ore tenus* motions to compel brought by Plaintiff. [*See* DE 46, 63]. Defendants were not substantially justified in their refusal to voluntarily produce the discovery the Court compelled at those hearings.

This Court's recommendation that attorneys' fees be assessed against Kleppin and Defendants, if adopted, will include those fees that would otherwise have been imposed under Rule 37(a)(4). Again, it would be redundant and burdensome to separately account for the fees caused by Defendants' failure to provide this discovery.

Therefore, no additional sanctions are recommended.

### D. Inherent power

 District courts possess the inherent power to regulate litigation and to sanction litigants and their counsel for abusive practices. *Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107, 126 (S.D.Fla.1987); *Amlong,* 457 F.3d at 1189. These powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (citation and internal quotation marks omitted).

 In this circuit, the "key to unlocking a court's inherent power is a finding of bad faith." *Byrne,* 261 F.3d at 1106 (citation and internal quotation marks omitted).

> Bad faith exists when the court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order. A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. In assessing whether an award is proper under the bad faith standard, the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case.

*Allapattah Servs., Inc.,* 372 F.Supp.2d at 1373 (citations and internal quotation marks omitted). On the record detailed in this Report and Recommendation, this

Court finds that Kleppin and Hussain[61] acted in bad faith in their defense of this lawsuit. This Court should exercise its inherent power to sanction both of them for their misconduct.

### 1. Tariq Hussain and the corporate defendants

This Court has thoroughly questioned Tariq Hussain and Mohammad Khan and carefully evaluated their testimony in light of their demeanor and all the evidence before this Court.[62] The Court finds that Hussain solicited from Khan an affidavit he knew to be false by offering a financial incentive (refinancing at a favorable interest rate), and did so in a fraudulent bid to have this lawsuit dismissed. The Court further finds that Hussain willfully falsified documents and refused to meet his discovery obligations. His conduct amounts to fraud upon this Court and merits the severest of sanctions.

The Court begins its analysis with Hussain's own testimony that, in late November or early December, 2005 Hussain met with Khan and offered to refinance his home at 6.75% interest. Later, on December 8, 2005, Khan and Hussain met at Hussain's office, where Khan signed the affidavit accusing Plaintiff of attempting to pay Khan for his false testimony. When Khan signed the affidavit, Hussain gave him the good faith estimate. Hussain pre-dated that document, and Khan post-dated it, to avoid the appearance that it had been offered in exchange for Khan's affidavit. And Hussain lowered the interest rate to 6.5% which, in addition to reducing the interest Khan would ultimately pay, would also reduce Hussain's commission by $1,000.

Thus, it is undisputed that Hussain offered Khan favorable refinancing terms once he signed the affidavit. The Court expressly rejects Hussain's testimony that the financing terms were not given in exchange for the affidavit as entirely incredible and contrary to the overwhelming evidence. The Court finds that Hussain corruptly solicited Khan's false testimony.

To begin, Khan told the lawyer he first consulted that his bribery accusation was false and that he made it because Hussain offered favorable refinancing terms. Later, Khan appeared in court and said that he had been advised to assert his Fifth Amendment privilege and that he could not afford to retain an attorney. Finally, once represented and under oath, Khan relied upon that privilege to not answer questions that directly went to the truthfulness of his affidavit and his motivation for signing that document. Thus, Khan declined to state whether Hussain offered him any benefit in exchange for signing the affidavit. [DE 106, p. 33]. He also refused to state whether Plaintiff had ever offered him a bribe so that he would falsely testify that she had worked for Hussain. [DE 106, pp. 33, 35–36]. Similarly, Khan did not answer whether he reported to Hussain, at the India House restaurant, that Plaintiff had offered him this bribe. [DE 106, pp. 22–23]. He also invoked the privilege and refused to state whether he signed the December 8, 2005 affidavit [DE 106, pp. 17–18], whether he met with Hus-

---

**61.** For simplicity, in this discussion reference often is made only to Hussain. The Court recognizes that by his actions in this litigation Hussain acted on his own behalf and on behalf of his companies. In the end, Hussain and the corporate defendants should be held jointly and severally liable for the sanctions imposed upon them.

**62.** In the process this Court has been careful to comply with the mandates of due process by providing notice and ample opportunity to be heard. *See Chambers,* 501 U.S. at 50, 111 S.Ct. 2123; *Carlucci v. Piper Aircraft Corp.,* 775 F.2d 1440, 1451–54 (11th Cir.1985).

sain on that date [DE 106, pp. 26, 31–32], and whether he deliberately post-dated the good faith estimate Hussain gave him on that date [DE 106, p. 33].

On this record, this Court may fairly draw an adverse inference against Defendants from Khan's refusal to respond to these questions from the Court.[63] Courts have identified a number of factors to consider when determining whether to permit such an adverse inference, none of which appear to be binding upon this Court. *See, e.g., United States ex rel. DRC, Inc. v. Custer Battles, LLC,* 415 F.Supp.2d 628, 633–36 (E.D.Va.2006); *LiButti v. United States,* 107 F.3d 110, 121–24 (2d Cir.1997). It appears, however, that "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *LiButti,* 107 F.3d at 125.

The circumstances here strongly lead this Court to conclude that an adverse inference—that Khan's bribery allegation was false, and that he made it in response to Hussain's offer of favorable refinancing terms—is trustworthy. Again, Khan admitted this to counsel. Moreover, the course of dealings between Hussain and Khan, and Khan's financial circumstances, support this inference. Hussain had previously helped Khan refinance his home and knew Khan remained seriously in debt.

He also knew Khan looked to his home equity to reduce his debt, and that with his poor credit Khan would find it difficult to borrow money on favorable terms. Thus, Hussain understood that Khan was likely to be vulnerable to his invitation to lie, if coupled with a financial incentive.

That Hussain would engineer such a serious false accusation against Plaintiff, and fraudulently promote it to the Court, is strongly supported by Hussain's own statements and actions. For instance, Hussain pre-dated the good faith estimate, and had Khan post-date it. Hussain then, on his own initiative, brought this falsely-dated document to Court as evidence of the legitimacy of the transaction. When the Court questioned Hussain about the inconsistencies on the good faith estimate, Hussain unapologetically testified that he and Khan falsely dated it to avoid the appearance that it had been offered in exchange for Khan's affidavit.

In addition to his solicitation of perjury, as already recounted in this Report and Recommendation, Hussain willfully and contemptuously refused to meet his discovery obligations. For instance, without ever looking at his financial records, Hussain gave sworn discovery responses that his companies' annual gross profits were less than that required for enforcement of the FLSA.[64] Similarly, even after the

---

**63.** *LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997); *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co. of Md.,* 45 F.3d 969, 977 (5th Cir.1995) (civil jury can draw a negative inference against party from non-party's invocation of Fifth Amendment); *RAD Servs., Inc. v. Aetna Cas. and Sur. Co.,* 808 F.2d 271, 275 (3d Cir.1986)("policies underlying the privilege . . . allow evidence of a non-party's refusal to testify"); *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 521 (8th Cir.1984) ("The policies supporting the Fifth Amendment apply with even less force when a non-party witness testifies in a civil proceeding and thus, the Amendment should

not work to preclude an adverse inference in this situation."); *United States ex rel. DRC, Inc. v. Custer Battles, LLC,* 415 F.Supp.2d 628, 633 (E.D.Va.2006) ("court may constitutionally permit a jury to draw an adverse inference from the refusal to testify on Fifth Amendment grounds by either a witness or party in a civil suit").

**64.** Remarkably, even after he produced corporate tax returns that demonstrated this information was false as to one company, Hussain again made the same false sworn statement in response to a supplemental interrogatory. [DE 48, p. 6].

Court ordered Defendants to identify all employees and independent contractors, Hussain responded with the names of only half of his small workforce. Hussain claimed he simply overlooked the "loan processor" letter, as he did the HUD–1 statements bearing Plaintiff's name. According to Hussain, these were all honest mistakes. This Court rejects that testimony as false.

In his memorandum [DE 100], Hussain argues that it was Kleppin alone who made the decision to file the Khan affidavit with the Court and Kleppin alone was responsible for Defendants' discovery violations. On this reasoning, Hussain maintains he did nothing to merit the imposition of sanctions; a contrary ruling, he argues, would be the result of this Court's failure to distinguish between Hussain's conduct and that of his lawyer.

This Court has painstakingly distinguished the actions of Hussain and Kleppin. Contrary to Hussain's efforts to foist all blame on Kleppin, there is no doubt that Hussain alone proposed getting an affidavit from Khan. Moreover, Hussain never disputed Kleppin's testimony that Kleppin wished to take Khan's deposition and that Hussain resisted this without good reason. Nor did he dispute Kleppin's testimony that Hussain "wasn't going to take no for an answer." [DE 66, p. 14]. Kleppin's observation that his client was "in a hurry to get this before the Court" and to "push this to the floor to resolve this" went without contradiction from Hussain. [DE 66, p. 15].

Likewise, the record speaks for itself and is replete with examples of Hussain's own willful attempts to defeat the discovery and truth-finding process. The assertion that Kleppin was to blame for Defendants' discovery violations is belied by Hussain's matter-of-fact testimony that he consciously denied Plaintiff's discovery inquiries without any regard for the truth because her lawsuit was "bogus" and a waste of his time.

### a. Appropriate sanctions

 Sanctions authorized under the court's inherent power include the striking of frivolous pleadings or defenses, disciplining lawyers, punishing for contempt, assessment of attorneys' fees and costs, and outright dismissal of a lawsuit. *Allapattah Servs., Inc.,* 372 F.Supp.2d at 1373. Because of their potency, inherent powers must be exercised with restraint and discretion. *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers,* 501 U.S. at 44–45, 111 S.Ct. 2123.

Outright dismissal of a lawsuit, or entry of a default judgment, is a "particularly severe sanction, yet is within the court's discretion." *Chambers,* 501 U.S. at 45, 111 S.Ct. 2123; *see also Telectron,* 116 F.R.D. at 126–27 (default judgment entered as sanction for defendant's willful destruction of documents sought in discovery).

> Before the ultimate sanction of default judgment may be entered, this Court must make the following findings: (1) that Defendant acted willfully or in bad faith; (2) that Plaintiff was prejudiced by Defendant's conduct; and (3) that lesser sanctions would not serve [the goals of punishment and deterrence].

*Telectron,* 116 F.R.D. at 131. This Court expressly makes each of these findings.

First, there is no doubt that Hussain acted willfully and in bad faith: he suborned Khan's perjury, falsely testified to this Court and cavalierly refused to truthfully respond to discovery. In the process he demonstrated his contempt for this Court's authority.

Second, there is no doubt Plaintiff has been prejudiced by Hussain's conduct. A party suffers prejudice if the opponents' actions impair its ability to go to trial or threaten to interfere with the rightful decision of the case. *Henry v. Gill Indus.*, 983 F.2d 943 (9th Cir.1993) (citations and internal quotation marks omitted). Here, Hussain deliberately withheld discovery from Plaintiff and corruptly solicited Khan's scandalous accusation. Combined, these actions derailed Plaintiff from litigating this case on the merits. In the process Hussain caused Plaintiff's legal fees to skyrocket. Defendants, however, contend that any prejudice caused by their discovery violations has been cured. They point to the ultimate production of the HUD–1 forms, tax returns and "loan processor" letter as proof that the discovery process has worked. Defendants suggest that this Court might reopen discovery to provide Plaintiff further opportunity to collect discoverable evidence.

Defendants, however, miss the point: on this record, this Court simply cannot trust that Defendants have produced, or ever will produce, all discoverable evidence. Hussain has demonstrated contumacious disregard for the judicial process; this has left the Court with the distinct concern that discoverable documents have been destroyed. It is thus impossible to have any confidence in the result of a trial on the merits.

This Court has thoroughly evaluated lesser sanctions and has concluded none would provide a just outcome of this case. Entry of a default judgment against all Defendants is the only sanction that makes Plaintiff whole for the prejudice she has suffered and punishes Hussain commensurately with the severity of his conduct. A default judgment is the most appropriate sanction in this case. *See Bryant v. City of Marianna,* 532 F.Supp. 133, 137

(N.D.Fla.1982); *Hall v. Leon County Bldg. Supply Co.,* 84 F.R.D. 372, 374 (N.D.Fla.1979)(default judgment offers something to replace access to the facts, which Defendant has hampered).

Finally, Defendants insist that entry of a default judgment on liability will create a far greater injustice, because Plaintiff did not work for Defendants and her lawsuit is a sham. In assessing whether an award is proper under the bad faith standard, "the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." *Allapattah Servs. Inc.,* 372 F.Supp.2d at 1373 (citation and internal quotation marks omitted). Here, the problem is, because of Defendants' misconduct, we can never know the truth. Defendants refused to defend this lawsuit on the merits and engaged in a sideshow of misconduct. They successfully undermined this Court's ability to resolve the case on the merits and now must live with the consequences.

For these reasons, it is recommended that this Court exercise its inherent power to impose a default judgment against all Defendants on liability. Each Defendant should be jointly and severally liable for the full amount of the judgment. This case should be set for trial on damages, and at the Court's discretion may be referred to the undersigned to determine the amount of fees and costs.

### 2. Chris Kleppin

██ This Court's inherent power extends equally to attorney misconduct. *Amlong,* 457 F.3d at 1189. A district court's authority to issue sanctions for attorney misconduct under § 1927 is "either broader than or equally as broad as the district court's authority to issue a sanctions order under its inherent powers." *Amlong,* 457 F.3d at 1189. Thus, as this circuit recently observed, "[i]f the sanc-

tions were permissible under § 1927, then they were proper, and there is no need to examine whether the sanctions were also permissible under the court's inherent powers." *Id.*

This Court has already found, in its analysis of 28 U.S.C. § 1927, that Kleppin engaged in bad faith in his representation of Defendants. See Section II(B). That finding also supports the imposition of sanctions against Kleppin pursuant to the Court's inherent power. For the reasons already stated, this Court recommends that Kleppin be ordered to compensate Plaintiff for all expenses she reasonably incurred as of December 21, 2006, flowing from the filing of the response memorandum.[65]

### III. Referral to the Bar

Kleppin was admitted to the bar of this Court in April, 2003. In the course of his representation of Defendants in this case, Kleppin has demonstrated significant breaches of professionalism. He has done so after having been admonished, or sanctioned, by other divisions of this Court.

This apparent pattern of misconduct raises concerns about the ongoing suitability of Chris Kleppin's admission to the Bar of this Court. It is recommended that, pursuant to this Court's Rules Governing Attorney Discipline, this Court refer to the Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance (Grievance Committee) this Report and Recommendation and the findings of other divisions of this Court cited earlier, for investigation and, if warranted, prosecution of formal disciplinary proceedings, or for the formulation of such other recommendations as the Grievance Committee may deem appropriate.

Chris Kleppin was admitted to the to the District of Columbia Bar in May, 2001 and to the Florida Bar in March, 2003. It appears this Report and Recommendation documents violations by Kleppin of the Rules of Professional Conduct, Chapter 4 of the Rules Regulating the Florida Bar; it may also document violations of the rules of the District of Columbia Bar. It is recommended that this Court refer this Report and Recommendation to both Bars for their review and for any action they deem appropriate.

### IV. Recommendations

For the foregoing reasons this Court RECOMMENDS that:

Plaintiff's Motion to Strike Defendants' Answer and Affirmative Defenses as Sanctions and Enter a Finding of Liability With Trial to be Held on the Issue of Damages **[DE 48, 12/15/06]**, and Plaintiff's Motion for Attorneys' Fees and Costs Pursuant to 28 U.S.C. Section 1927; Federal Rules of Civil Procedure 26(g), 37(a), (b), and (c) and the Court's Inherent Powers **[DE 82, 2/13/06]**, be granted as follows:

A. A default judgment be entered against Defendants, with each Defendant being jointly and severally liable for the entire amount of that default judgment and the reasonable attorneys' fees that will arise by operation of law,[66] and that this matter be set for trial on damages;

---

**65.** If the Court adopts the recommended sanctions, at a subsequent hearing on fees it should address the extent to which it must consider the financial circumstances of the parties being sanctioned. *See Martin v. Automobili Lamborghini Exclusive, Inc.,* 307 F.3d 1332, 1337 (11th Cir.2002).

**66.** As the prevailing party, Plaintiff will be entitled to recover from Defendants her attorneys' fees. 29 U.S.C. § 216(b); *Kreager v. Solomon & Flanagan, P.A.,* 775 F.2d 1541, 1542 (11th Cir.1985)(fee award mandatory for prevailing plaintiff).

B. That Chris Kleppin be ordered to compensate Plaintiff for her attorneys' fees and costs reasonably incurred as of December 21, 2006 as a result of the filing of the response memorandum, and that Kleppin be held jointly and severally liable with Defendants for payment of those amounts;

C. That this Court refer a copy of this Report and Recommendation to this Court's Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance, and to the Florida Bar and the District of Columbia Bar for the reasons expressed in this Report and Recommendation.

## V. Deadline for Objections

Plaintiff, Defendants and Chris Kleppin shall have ten days from the date of this Report and Recommendation to file written objections, if any, for consideration by the Honorable Patricia A. Seitz, United States District Judge. A courtesy copy of any objections shall be hand-delivered to the chambers of Judge Seitz by that deadline. Failure to file timely objections shall bar the parties from attacking on appeal any factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993).

September 20, 2006.